**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| IN RE: | **CHAPTER 11** |
| **SIGNATURE PACK, LLC,** | |
| | **CASE NO. 19-20916-JRS** |
| Debtor. | |
| **SIGNATURE PACK, LLC,** | |
| Movant, | |
| v. | |
| **VERSACOLD USA, INC.,** | **CONTESTED MATTER** |
| Respondent. | |

**NOTICE OF HEARING**

PLEASE TAKE NOTICE that on December 4, 2019, Debtor filed a *Motion to Assume Non-Residential Real Property Located at 86 Jackson Concourse, Pendergrass, Jackson County, Georgia* (the "Motion").

**PLEASE TAKE FURTHER NOTICE that the Court shall hold a hearing on the Motion on the 28th day of January, 2020, at 1:00 o'clock p.m., Courtroom 1404, Richard B. Russell Federal Building, 75 Ted Turner Drive, SW, Atlanta, Georgia.** *THIS MATTER IS BEING SET IN ATLANTA ON A GAINESVILLE DIVISION CASE.*

Your rights may be affected by the court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the court to grant the relief sought in these pleadings or if you want the court to consider your views, then you and/or your attorney must attend the hearing. You may also file a written response to the pleading with the Clerk at the address stated below, but you are not required to do so. If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk at least two business days before the hearing. The address of the Clerk's Office is Clerk, U.S. Bankruptcy Court, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303. You must also mail a copy of your response to the undersigned at the address stated below.

This 4th day of December, 2019.

**JONES & WALDEN, LLC**
*/s/ Leslie M. Pineyro*
Leslie M. Pineyro
Georgia Bar No. 969800
Attorney for Debtor
21 Eighth Street, NE, Atlanta, Georgia 30309
lpineyro@joneswalden.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| IN RE:<br><br>**SIGNATURE PACK, LLC,**<br><br>　　　　**Debtor.** | **CHAPTER 11**<br><br>**CASE NO. 19-20916-JRS** |
| **SIGNATURE PACK, LLC,**<br><br>　　　　**Movant,**<br><br>**v.**<br><br>**VERSACOLD USA, INC.,**<br><br>　　　　**Respondent.** | **CONTESTED MATTER** |

**MOTION TO ASSUME NON-RESIDENTIAL REAL PROPERTY LEASE**
**FOR PROPERTY LOCATED AT 86 JACKSON CONCOURSE,**
**PENDERGRASS, JACKSON COUNTY, GEORGIA**

COMES NOW, Signature Pack, LLC ("Debtor"), the Debtor and Debtor-In-Possession in the above-styled Chapter 11 Bankruptcy Case (the "Debtor"), and hereby files its *Motion to Assume Non-Residential Real Property Lease for Property Located at 86 Jackson Concourse, Pendergrass, Jackson County, Georgia* (the "Motion"), respectfully showing the Court as follows:

1.　　This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. Venue of this proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.　　On May 9, 2019 (the "Petition Date"), Debtor filed a petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (as amended, modified or supplemented, the "Bankruptcy Code").

3.　　In accordance with Sections 1107(a) and 1108 of the Bankruptcy Code, Debtor continues to manage its financial and business affairs as a debtor in possession.

4.　　Debtor is in the process of preparing a plan of reorganization and negotiating the potential sale of its business assets.

5.      Debtor is a party to that certain lease between Versacold USA, Inc. ("Landlord") and Debtor, as tenant, dated November 13, 2018 (the "Lease") for premises located at 86 Jackson Concourse, Pendergrass, Jackson County, Georgia 30567 (the "Premises"). A true and correct copy of the Lease is attached hereto as Exhibit "A."

6.      Debtor seeks entry of an order pursuant to Section 365 of the Bankruptcy Code authorizing the assumption of the Lease.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases subject to the approval of the Bankruptcy Court:

> (a)      Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
>
> (b)(1)   If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--
>
> (A)      cures, or provides adequate assurance that the trustee will promptly cure, such default;
> (B)      compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> (C)      provides adequate assurance of future performance under such contract or lease…

7.      The Lease is integral to Debtor's ongoing operations and is necessary for an effective reorganization or sale of the Debtor's assets.  Upon information and belief, Debtor is current on all post-petition obligations to the Landlord and owes Landlord a pre-petition arrearage of approximately $393,704.47[1] (the allowed amount of arrearage shall be referred to as the "Cure Amount"), consisting of (1) the scheduled pre-petition arrearage through April 2019 of $ 373,906.47 and (2) partial May 2019 rent (for May 1 through the Petition Date) of

---

[1] On August 8, 2019, Landlord filed proof of claim number 39 asserting conflicting amounts due and without any schedules showing how such amount was calculated.  The two conflicting amounts are $424,872.17 and $459,982.97.  Simultaneously with this Motion, Debtor has filed an Objection to the Landlord's Proof of Claim.

$19,800.00.  Debtor will cure the Allowed Cure Claim at the rate of $16,500 per month (the "Cure Payment") until the Cure Amount is paid in full (the "Cure Period") with such Cure Period commencing on the last day of the first month following the entry of an order granting Debtor's Motion and continuing on the last day of each subsequent month until paid in full[2].  Alternatively, if the Debtor sells its assets and assigns the Lease prior to the expiration of the Cure Period, then (a) Debtor will pay the Cure Amount at the closing, or (b) the assignee shall pay the Cure Payment for the Cure Period.

WHEREFORE, Debtor requests that this Court grant the Motion and that the Debtor be granted such other relief as may be just and proper.

Respectfully submitted this 4th day of December, 2019.

**JONES & WALDEN, LLC**

/s/ *Leslie M. Pineyro*
Leslie M. Pineyro
Georgia Bar No. 969800
21 Eighth Street NE
Atlanta, Georgia 30309
(404) 564-9300 Telephone
(404) 564-9301 Facsimile
lpineyro@joneswalden.com

---

[2] Or if the last day of the applicable month is not a business day, the next day that is not a Saturday, Sunday, a day that banks are not required to be open for business in Atlanta, Georgia, or a day recognized as a legal holiday by the District Court.

# Exhibit "A"

# RENTAL AGREEMENT

THIS RENTAL AGREEMENT hereinafter referred to as the (**"Agreement"** or **"Rental Agreement"**) is made and entered into this **15** day of ~~June~~, 2018 with an effective date of July 1, 2018 by and between Versacold USA, Inc. with its headquarters at 10 Glenlake Parkway, South Tower, Suite 600, Atlanta, GA 30328 (**"Landlord"**), and Signature Pack, LLC with its primary offices located at 5786 Highway 129 North, Suite N, Pendergrass, GA 30567 (**"Tenant"**), collectively referred to as the **"Parties"**.

## RECITALS

**The following Recitals shall apply to this Rental Agreement:**

A. Landlord is the owner of certain property located at 86 Jackson Concourse, Pendergrass, GA 30567, a cold storage facility operated and/or managed by Landlord's affiliate, Americold Logistics, LLC; and;

B. Tenant desires to rent from Landlord certain freezer warehouse space, dock space and office space in the Facility, as more particularly described herein, and Landlord is willing to rent such space to Tenant.

## COVENANTS

**NOW, THEREFORE, for valuable consideration, including the mutual covenants set forth below, the sufficiency of which is hereby acknowledged, Landlord and Tenant agree as follows:**

1.  **Definitions**. The following definitions shall apply to this Rental Agreement:

    (a)   **Rentable Square Footage of Entire Facility**: Approximately 244,146 square feet.

    (b)   **Tenant's Proportionate Share**: 23.90% of the Rentable Square Footage of Entire Facility.

    (c)   The term **"Minimum Annual Rent"** shall mean Five Hundred and Five Thousand Five Hundred Ninety Four Dollars and Ninety Seven Cents ($505,594.97) per year, subject to increases pursuant to <u>Section 5.01</u> hereof.

    (d)    The term **"Monthly Minimum Rent Installments"** shall mean Forty Two Thousand One Hundred Thirty Two Dollars and Ninety One Cents ($42,132.91) per month, subject to increases pursuant to <u>Section 5.02</u> hereof.

1

(e)     Address for notices are as follows:

Landlord:              Versacold USA, Inc.
                       c/o Americold Logistics, LLC
                       10 Glenlake Parkway, South Tower
                       Suite 600
                       Atlanta, Georgia 30328
                       Attn: Real Estate Director

With a Copy to:
                       Versacold USA, Inc.
                       c/o Americold Logistics, LLC
                       10 Glenlake Parkway, South Tower
                       Suite 600
                       Atlanta, Georgia 30328
                       Attn: General Counsel

with payments sent to an address as designated by Landlord in writing
from time to time.

Tenant:                Signature Pack, LLC
                       5786 Highway 129 North
                       Suite N
                       Pendergrass, GA 30567
                       Attn: Lee Turner, CFO

2.     **Premises:** Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises, under the terms and conditions herein, together with a non-exclusive right, in common with others, to use the following (collectively, the **"Common Areas"**): the areas of the Facility and the underlying lands and improvements thereto that are designed for use in common by all tenants of the Facility and their respective employees, agents, customers, invitees and others and the Breakroom and restrooms. The **"Premises"**, as each is shown in the location on **Exhibit A**, shall include the following defined areas in the Facility:

a) Dock space (maintained at 35⁰-45⁰ F) (including small office area) containing approximately 8,332 square feet.
b) Processing Area (maintained at 35⁰-45⁰ F) along rail dock containing approximately 11,300 square feet inclusive of offices.
c) Freezer space containing approximately 38,720 square feet.

So long as Tenant is in compliance with the terms of this Agreement (including, without limitation, the insurance requirements set forth herein), Tenant may access the Premises twenty four (24) hours a day, including at any time during Facility business hours via the main entrance of the Facility. Other than the Premises, Tenant may not access the other areas of the Facility at any time.

3.    **Acceptance; Improvements**. Tenant has inspected and knows the condition of the Premises and accepts the same in its present condition, AS IS. To the extent allowable by law, Landlord expressly disclaims all warranties and/or representations whether express, implied or statutory, including but not limited to all implied or statutory warranties of merchantability, fitness for a particular purpose, title, quality, accuracy and non-infringement of third party rights whether as to the condition of the Premises or their suitability for use as anticipated by Tenant and allowed hereunder.

4.    **Term:**

a.    The term of this Agreement shall commence on the 1st day of January, 2018 (the **"Commencement Date"**) and shall terminate on December 31, 2022 (the entire period of the lease shall be called the **"Term"**).

b.    In the event Landlord or its successor in interest decides to cease its cold storage activities at the Facility, which Landlord may decide in its sole and absolute discretion, Landlord may terminate this Agreement by giving no less than nine (9) months' notice to Tenant of Landlord's termination of the Agreement. The effective termination date of the Agreement shall be the date set forth in such notice; and, except for any provisions of this Agreement expressly surviving the expiration or earlier termination of this Agreement, this Agreement shall thereafter be of no further force and effect. Tenant expressly acknowledges that it shall have no claims against Landlord arising directly or indirectly from such termination.

5.    **Rent:**

5.01. <u>Base Rent</u>. Tenant shall pay to Landlord the Minimum Annual Rent in the Monthly Minimum Rent Installments in advance, without demand, abatement, deduction or offset, on the first day of the month following the Effective Date and on or before the first day of each and every calendar month thereafter during the Lease Term. The Monthly Minimum Rent Installments for partial calendar months shall be prorated. Tenant shall be responsible for delivering the Monthly Minimum Rent Installments to the payment address set forth in <u>Section 1 (e)</u> above in accordance with this <u>Section 5.01</u> or to such other address or account as directed by Landlord. The parties agree that the Minimum Annual Rent shall be increased on a calendar year schedule (outlined below) by two and a half percent (2.5%) per year.

|  | Minimum Annual Base Rent | Monthly Minimum Base Rent Installments |
|---|---|---|
| July 2018 - Dec 2018 | $505,594.97 | $42,132.91 |

3

| Jan 2019 - Dec 2019 | $518,234.85 | $43,186.24 |
|---|---|---|
| Jan 2020 - Dec 2020 | $531,190.72 | $44,265.89 |
| Jan 2021 - Dec 2021 | $544,470.49 | $45,372.54 |
| Jan 2022 - Dec 2022 | $558,082.25 | $46,506.85 |

5.02. Annual Rental Adjustment Definitions.

(a) **"Annual Rental Adjustment"** shall mean the amount of Tenant's Proportionate Share of Operating Expenses for a particular calendar year.

(b) **"Operating Expenses"** shall mean the amount of all of Landlord's costs and expenses paid or incurred in operating, repairing, replacing, insuring and maintaining the Facility and the Common Areas in good condition and repair for a particular calendar year including by way of illustration and not limitation, the following: all Real Estate Taxes (as hereinafter defined), insurance premiums and deductibles to the extent provided in Section 16 below; sanitation, security, other services as defined in Section 6 below, dues, fees and assessments incurred under any covenants or charges by any owners association, and maintenance and repair of the Facility as defined in Section 9 below. The cost of any Operating Expenses that are capital in nature shall be amortized over the useful life of the improvement (as reasonably determined by Landlord), and only the amortized portion shall be included in Operating Expenses.

(c) **"Tenant's Proportionate Share of Operating Expenses"** shall mean an amount equal to the product of Tenant's Proportionate Share times the Operating Expenses.

(d) **"Real Estate Taxes"** shall mean any form of real estate tax or assessment or service payments in lieu thereof, and any license fee, commercial rental tax, improvement bond or other similar charge or tax (other than inheritance, personal income or estate taxes) imposed upon the Facility or Common Areas, or against Landlord's business of leasing the Facility, by any authority, together with costs and expenses of contesting the validity or amount of the Real Estate Taxes. Tenant shall pay Landlord, as Additional Rent, Tenant's Proportionate Share of Real Estate Taxes.

5.03. Payment of Additional Rent

(a) Any amount required to be paid by Tenant hereunder (in addition to Minimum Annual Rent) and any charges or expenses incurred by Landlord on behalf of Tenant under the terms of this Agreement shall be considered **"Additional Rent"** payable in the same manner and upon the same terms and conditions as the Minimum Annual Rent reserved hereunder, except as set forth herein to the contrary. Any failure on the part of Tenant to pay such Additional Rent when and as the same shall become due shall entitle Landlord to the remedies available to it for non-payment of Minimum Annual Rent.

4

(b) In addition to the Minimum Annual Rent specified in this Agreement, commencing as of the first day of the month following the Effective Date, Tenant shall pay to Landlord as Additional Rent for the Premises, in each calendar year or partial calendar year during the Lease Term, (i) Tenant's Proportionate Share of Real Estate Taxes, (ii) Electrical Charges (not separately metered and billed directly to Tenant by utility) and (iii) an amount equal to the Annual Rental Adjustment for such calendar year. Landlord shall estimate the Annual Rental Adjustment annually, and written notice thereof shall be given to Tenant. Tenant shall pay to Landlord each month, at the same time the Monthly Minimum Rent Installment is due, an amount equal to one-twelfth (1/12) of the estimated Annual Rental Adjustment. Tenant shall be responsible for delivering the Additional Rent to the payment address set forth in Section 1 (e) above in accordance with this Section 5.03. If Operating Expenses increase during a calendar year, Landlord may increase the estimated Annual Rental Adjustment during such year by giving Tenant written notice to that effect, and thereafter Tenant shall pay to Landlord, in each of the remaining months of such year, an amount equal to the amount of such increase in the estimated Annual Rental Adjustment divided by the number of months remaining in such year. Within a reasonable time after the end of each calendar year, Tenant shall pay to Landlord, or Landlord shall credit against the next rent payment or payments due from Tenant, as the case may be, the difference between the actual Annual Rental Adjustment for the preceding calendar year and the estimated amount paid by Tenant during such year. This Section 5.03 shall survive the expiration or any earlier termination of this Lease.

5.04. Late Charges. Tenant acknowledges that Landlord shall incur certain additional unanticipated administrative and legal costs and expenses if Tenant fails to pay timely any payment required hereunder. Therefore, in addition to the other remedies available to Landlord hereunder, if any payment required to be paid by Tenant to Landlord hereunder shall become overdue, such unpaid amount shall bear interest from the due date thereof to the date of payment at the *lesser* of the rate of eighteen percent (18%) per annum or the maximum legal rate of interest.

6. **Services**. Landlord may obtain in its own name, and pay directly to the appropriate supplier, the cost of all water, sewer, electrical, natural gas, Freon, ammonia, refrigerant and other utilities and services which serve the Premises, provided that the cost of all such utilities and services shall be subject to reimbursement by Tenant to Landlord. Tenant's share of the cost for the services or utilities, exclusive of Power, that are provided to the Facility generally and are not separately sub metered shall be based on Tenant's Proportionate Share of the total Facility service cost and included in the Annual Rental Adjustment. Notwithstanding the foregoing, Landlord may require that Tenant arrange, at Tenant's sole expense, for any or all of such services including electrical usage be separately metered at the Premises and that Tenant contract directly with, and pay for the cost of such services directly to, the applicable utility provider. Landlord shall not be liable in damages or otherwise for any failure or interruption of any utility or other service and no such failure or interruption shall entitle Tenant to terminate this Agreement or withhold sums due hereunder or constitute an actual or constructive eviction of Tenant.

**6.01 Electrical Charges:** Tenant shall continue to pay for the electrical usage of their processing equipment on a monthly basis based upon the corresponding meter reading. All remaining power usage for the Premises has been calculated based upon historical electrical usage. The following predetermined KWH usage shall be billed each

month by multiplying the predetermined KWH usage by the current months corresponding per KWH cost.

      a) Freezer and Dock Monthly Usage – 141,507 KWH.
      b) Battery Charger Monthly Usage – 24,476 KWH.
      c) Processing Equipment Monthly Usage – Actual KWH usage determined by corresponding separate meter.

7. **Security Deposit/Letter of Credit**.

    7.01. <u>Security Deposit.</u> Tenant shall deposit with Landlord a security deposit (the "Security Deposit") in the amount of $42,132.91, in 12 equal monthly installments of $3,511.08, the first of which shall be due within ten (10) days of Tenant's execution of this Agreement with the all other payments due on the first of each term month until the Security Deposit is paid in full. The Security Deposit shall be held by Landlord as security for the faithful performance by Tenant of all the terms, covenants, and conditions of this Agreement. If Tenant fails to pay rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Agreement, Landlord may use, apply or retain all or any portion of said deposit for the payment of any rent or other charge in default or for the payment of any other sum to which Landlord may become obligated by reason of Tenant's default, or to compensate Landlord for any loss or damage which Landlord may suffer thereby. If Landlord uses or applies all or any portion of said deposit, Tenant shall within ten (10) days after written demand therefor, deposit cash with Landlord in an amount sufficient to restore said deposit to the full amount herein above stated. Tenant's failure to do so shall be a material breach of this Agreement. Landlord shall not be required to keep said deposit separate from its general accounts. If Tenant performs all of Tenant's obligations hereunder, said deposit or balance thereof, shall be returned, without payment of interest or other increment for its use to Tenant or at Landlord's option, to the last assignee, if any, of Tenant's interest hereunder within sixty (60) days following the expiration of the Term.

8. **Alterations**.

    8.02. <u>Additional Alterations.</u> Tenant shall not permit any additional alterations in or to the Premises unless and until Landlord has approved the plans therefor in writing which approval may be granted or withheld in Landlord's sole discretion. As a condition of any Landlord approval in this Section 8, Landlord may, at its option, and in its sole and absolute discretion, require Tenant to remove the alterations and restore the Premises to a structurally safe and sound condition and to the condition as required under Section 22 Surrender, upon termination of this Agreement otherwise, all such alterations shall, at Landlord's option, become a part of the realty and the property of Landlord, and shall not be removed by Tenant. All currently existing (previously installed) Tenant Alterations are hereby approved by Landlord and removal is required by Tenant upon expiration or early termination of this Agreement. Tenant shall ensure that all alterations shall be made in accordance with all applicable laws, regulations and building codes, in a good and workmanlike manner and of quality equal to or better than the original construction of the Premises. No person shall be entitled to any lien derived through or under Tenant for any labor of material furnished to the Premises, and nothing in this Lease shall be construed to constitute

Landlord's consent to the creation of any lien. If any lien is filed against the Premises for work claimed to have been done for or material claimed to have been furnished to Tenant, Tenant shall cause such lien to be discharged of record within thirty (30) days after filing. Tenant shall indemnify Landlord from all costs, losses, expenses and attorneys' fees in connection with any construction or alteration and any related lien. Tenant agrees that at Landlord's option, Landlord or a subsidiary or affiliate of Landlord, who shall receive a fee as Landlord's construction manager or general contractor, shall perform or cause to be performed all work on any alterations to the Premises.

9. **Maintenance and Repair.**

9.01 <u>Landlord Obligation</u> At Landlord's sole discretion, Landlord shall make all necessary repairs, replacements and maintenance to the refrigeration equipment, roof, sprinkler systems, exterior walls, foundation, electrical systems, floors, plumbing systems, structural frame of the Premises, the access and security drives, parking and landscaped areas adjacent to the Premises. The cost for any such repair maintenance or replacement as set forth above shall be deemed Operating Expenses and shall be subject to reimbursement from Tenant to Landlord and paid as part of the Annual Rental Adjustment according to Section 5 above.

9.02 <u>Tenant Obligation</u> Tenant shall maintain the entire Premises in good condition and repair and shall permit no waste, damage or injury to the Premises. Tenant shall promptly repair at Tenant's expense any damage, waste or injury to the Premises or the Facility, other than the areas specified above, which is caused by Tenant, its employees, contractors, agents or invitees or Tenant's specific use. Tenant shall be solely responsible for the repair, replacement and maintenance of all Tenant improvements, fixtures, lighting, air conditioning systems servicing Tenant's office space and any sub-metered utility equipment. If Tenant fails to perform any such repair for which Tenant is obligated, Landlord may elect to perform the work on Tenant's behalf and at Tenant's sole expense. If Landlord performs any such repair for which Tenant is obligated, Tenant shall reimburse such costs immediately on demand together with ten percent (10%) of such amount as a reimbursement to Landlord for the administrative expense it reasonably expects to incur and also with interest at the rate of twelve percent (12%) per annum or the highest rate allowable by law, whichever is lower, from the date Landlord incurs such expense.

10. **Permitted Use.** During the Term, Tenant will occupy and use the Premises solely as a warehouse for the storage and handling of food products, for general office and administrative purposes (with respect to the office space portion of the Premises) and for loading and unloading of Tenant's product (with respect to the dock space portion of the Premises). Notwithstanding anything herein to the contrary: (a) Tenant shall not use the Premises for any unlawful purpose; (b) Tenant shall use the Premises for processing and re-packaging as currently approved by Landlord. (c) Tenant shall not subject, or through its actions or inaction allow, the Premises or the Facility to become subject to any mechanic's lien, mortgage, or any lien of any kind whatsoever; (d) Tenant shall maintain the Premises in compliance with all federal, state and local laws, rules and regulations (including, without limitation, any regulations imposed by the USDA or other regulatory body with respect to the storage of food products) now or hereafter in effect; (e) Tenant shall not permit any bill of lading, warehouse receipt, label or other document related to food products to bear the mark "Americold" as the name or address of the warehouse or shipper or in any other fashion. (f) Tenant shall not solicit for third party storage any customer known

7

to Tenant to be a storage customer of Landlord or any of Landlord's affiliates and (g) Tenant shall comply with all rules and regulations established by Landlord from time to time during the Term with respect to Tenant's use and occupancy of the Premises.

Tenant shall not do or permit anything to be done in or about the Premises that will in any way cause a nuisance, obstruct or interfere with the rights of other tenants or occupants, including but not limited to their employees, contractors invitees, and other visitors, of the Facility or injure or annoy them. Landlord shall not be responsible to Tenant for the non-performance by any other tenant or occupant of the Facility of any of Landlord's directions, rules and regulations. Tenant shall not overload the floors of the Premises. All damage to the floor structure or foundation of the Facility due to improper positioning or storage of items or materials shall be repaired by Landlord at the sole expense of Tenant, who shall reimburse Landlord immediately therefor upon demand. Tenant shall not use the Premises, nor allow the Leased Premises to be used, for any purpose or in any manner that would (i) invalidate any policy of insurance now or hereafter carried by Landlord on the Facility, or (ii) increase the rate of premiums payable on any such insurance policy unless Tenant reimburses Landlord for any increase in premium charged.

11. **Signage.** Tenant shall have no right to display any signage at the Facility or in the Premises. Any signage in or about the Premises must first be first approved by Landlord, in its sole discretion, and shall be in compliance with the any codes and recorded restrictions applicable to the sign or the Premises. The location, size and style of all signs shall be subject to approval by Landlord, which may be granted or withheld in Landlord's sole discretion. Tenant agrees to maintain any such approved sign in good state of repair, and upon expiration of the Lease Term, Tenant agrees to promptly remove such signs and repair any damage to the Premises or Facility caused thereby.

12. **Parking.** Tenant shall be entitled to the non-exclusive use of the parking spaces designated for the Facility by Landlord. Tenant agrees not to overburden the parking facilities and agrees to cooperate with Landlord and other tenants in the use of the parking facilities. Landlord reserves the right in its absolute discretion to determine whether parking facilities are becoming crowded and, in such event, to allocate parking spaces between Tenant and other tenants. There will be no assigned parking unless Landlord, in its sole discretion, deems such assigned parking advisable. No vehicle may be repaired or serviced in the parking area and any vehicle brought into the parking area by Tenant, or any of Tenant's employees, contractors or invitees, and deemed abandoned by Landlord will be towed and all costs thereof shall be borne by the Tenant. All driveways, ingress and egress, and all parking spaces are for the joint use of all tenants. There shall be no parking permitted on any of the streets or roadways serving the Facility. In addition, Tenant agrees that its employees will not park in the spaces designated visitor parking.

13. **Use of Americold's Equipment.** Tenant shall use its own personal property and equipment (e.g., forklifts) for its operations within the Premises. Any use by Tenant of Landlord's or Americold's "Equipment" (as defined herein) is strictly prohibited. Tenant acknowledges that neither Landlord nor Landlord's personnel are authorized to modify or amend this Section 13, nor may Landlord or its personnel grant any permission to Tenant to use Americold's Equipment. Due to, among other reasons, liability concerns, Landlord and Americold Logistics, LLC ("Americold") may not permit Tenant to

8

utilize Americold's personal property or equipment (collectively, the "Equipment") at any time. Tenant acknowledges that only the CEO or CFO of Landlord or Americold may grant the right to use the Equipment and any such grant must be in writing and signed by the CEO or CFO to be effective). Any use of the Equipment, whether authorized or unauthorized, shall be at Tenant's sole risk and expense and Tenant shall assume all liability for any loss, damage or injury resulting from such use. **NEITHER LANDLORD NOR AMERICOLD WARRANTS THAT ITS EQUIPMENT IS SAFE, SUITABLE FOR THE PURPOSES INTENDED, MECHANICALLY SOUND, OR IN COMPLIANCE WITH ANY LAWS, RULES OR REGULATIONS.**

14. **Contamination:**

a. Tenant warrants that its personal property will not be infested with vermin, insects, pests or bacteria or otherwise present a danger to others, the Facility, or other products stored in the Facility. Tenant shall maintain an ongoing program, acceptable to Landlord, for the prevention of rodent, insect and other infestation in the Premises and, upon request, Tenant shall make available a copy of such program to Landlord.

b. In no event shall Tenant generate, use, store, or dispose of any pollutant or hazardous or toxic waste material or substance at or near the Facility.

c. Tenant hereby agrees to indemnify and hold Landlord and its affiliates, members, directors, officers, employees, agents and affiliates (including Americold, collectively, the "**Landlord Indemnitees**") harmless from and defend them against any and all losses, expenses, damages and costs, including reasonable attorney's fees and court costs actually incurred, arising from or attributable to claims alleging loss, damage or liability as a result of the contamination of any product or personal property of Tenant; the release of a pollutant or hazardous or toxic waste material or substance at or near the Facility by Tenant, its employees, agents, contractors or invitees, or arising from or attributable to any other failure to comply with the terms of this Section 14. Tenant further agrees to pay Landlord Indemnitees, on demand, all costs and expenses incurred by Landlord Indemnitees in connection with or attributable to any contamination caused directly or indirectly by Tenant's products or personal property or Tenant failure to comply with the terms of this Section 14, including, but not limited to removal and storage costs; losses due to the destruction of contaminated product or personal property; fines or penalties assessed under any federal, state or local law, ordinance, rule or regulation now or hereafter in effect with respect to any pollutant, contaminate or hazardous waste or substance; the cleaning and sanitation of the Premises and/or Facility; and the costs of inspections of experts and government officials of the Premises and/or the Facility.

d. In the event Tenant violates any of the provisions of this Section 14, Landlord may terminate this Agreement immediately on written notice to Tenant and Tenant shall have no opportunity or right to cure such violation or otherwise nullify Landlord's termination. The provisions of this Section 14 shall survive the expiration or earlier termination of this Agreement.

15. **Hazardous Materials.**

9

    a.   Environmental Definitions.

       (i)  **"Environmental Laws"** shall mean all present or future federal, state and municipal laws, ordinances, rules and regulations applicable to the environmental and ecological condition of the Premises or imposing liability or standards of conduct concerning public health and safety or the environment, and the rules and regulations of the Federal Environmental Protection Agency and any other federal, state or municipal agency or governmental board or entity now or hereafter having jurisdiction over the Premises.

       (ii)  **"Hazardous Substances"** shall mean any materials or substances regulated by Environmental Laws, including those within the definitions of "hazardous substances," "hazardous materials," "chemical mixture or substance", "air pollutant", "toxic substances" "solid waste" or "infectious waste" under Environmental Laws and petroleum products.

    b.   Restrictions on Tenant.  Tenant shall not cause or permit the use, generation, release, manufacture, refining, production, processing, storage or disposal of any Hazardous Substances on, under or about the Premises, or the transportation to or from the Premises of any Hazardous Substances, except as necessary and appropriate for its Permitted Use in which case the use, storage or disposal of such Hazardous Substances shall be performed in compliance with the Environmental Laws and the highest standards prevailing in the industry.

    c.   Notices, Affidavits, Etc.  Tenant shall immediately (a) notify Landlord of (i) any actual or alleged violation by Tenant, its employees, agents, representatives, customers, invitees or contractors of any Environmental Laws on, under or about the Premises, or (ii) the presence or suspected presence of any Hazardous Substances on, under or about the Premises, and (b) deliver to Landlord any notice received by Tenant relating to (a)(i) and (a)(ii) above from any source. Tenant shall execute affidavits, representations and the like within five (5) days of Landlord's request therefor concerning Tenant's best knowledge and belief regarding the presence of any Hazardous Substances on, under or about the Premises.

    d.   Tenant's Indemnification.  Tenant shall indemnify Landlord and Landlord's managing agent from any and all claims, losses, liabilities, costs, expenses and damages, including without limitation reasonable attorneys' fees, costs of testing and remediation costs, incurred by Landlord in connection with any breach by Tenant of its obligations under this Section 15. The covenants and obligations under this Section 15 shall survive the expiration or earlier termination of this Lease.

## 16.   **Insurance, Liability and Indemnity.**

   16.01. Release. All of Tenant's trade fixtures, food products, merchandise, product, inventory and all other personal property in or about the Premises or the Facility, which is deemed to include the trade fixtures, food products, merchandise, inventory and personal property of others located in or about the Premises or Facility at the invitation, direction or acquiescence (express or implied) of Tenant (all of

which property shall be referred to herein, collectively, as "**Tenant's Property**"), shall be and remain at Tenant's sole risk. Landlord shall not be liable to Tenant or to any other person for, and Tenant hereby releases Landlord from (a) any and all liability for theft or damage, no matter how caused, to Tenant's Property, and (b) any and all liability for any injury to Tenant or its employees, agents, contractors, guests and invitees in or about the Premises or the Facility, including if caused by the negligence of Landlord, its agents, contractors or employees, except to the extent of personal injury (but not property loss or damage) caused directly by the gross negligence or willful misconduct of Landlord, its agents, employees or contractors. Nothing contained in this Section 16.01 shall limit (or be deemed to limit) the waivers contained in Section 16.06 below. In the event of any conflict between the provisions of Section 16.06 below and this Section 16.01, the provisions of Section 16.06 shall prevail. This Section 16.01 shall survive the expiration or earlier termination of this Lease.

16.02. Indemnification by Tenant. Tenant shall protect, defend, indemnify and hold Landlord, its affiliates, agents, employees and contractors harmless from and against any and all claims, damages, demands, penalties, costs, liabilities, losses, and expenses (including without limitation reasonable attorneys' fees and expenses at the trial and appellate levels) to the extent (a) arising out of or relating to any act, omission, negligence, gross negligence or willful misconduct of Tenant or Tenant's agents, employees, contractors, customers or invitees in or about the Premises, the Facility, or the Common Areas, including, but not limited to, costs and expenses incurred by Landlord resulting from claims made by employees, including Tenant's employees, which may or may not otherwise be subject to applicable "worker's compensation" laws, (b) arising out of or relating to any of Tenant's Property, or (c) arising out of any other act or occurrence within the Premises in all such cases, including those arising out of the negligence of Landlord, its agents, employees and contractors, but excluding damages caused directly by the gross negligence or willful misconduct of Landlord, its agents, employees or contractors. Nothing contained in this Section 16.02 shall limit (or be deemed to limit) the waivers contained in Section 16.06 below. In the event of any conflict between the provisions of Section 16.06 below and this Section 16.02, the provisions of Section 16.06 shall prevail. This Section 16.02 shall survive the expiration or earlier termination of this Lease.

16.03. Indemnification by Landlord. Landlord shall protect, defend, indemnify and hold Tenant, its employees officers, and directors harmless from and against any and all claims, damages, demands, penalties, costs, liabilities, losses and expenses (including without limitation reasonable attorneys' fees and expenses at the trial and appellate levels) for personal injury and/or death of a person to the extent arising out of any gross negligence or willful misconduct of Landlord or Landlord's employees officers, or directors. Nothing contained in this Section 16.03 shall limit (or be deemed to limit) the waivers contained in Section 16.06 below. In the event of any conflict between the provisions of Section 16.06 below and this Section 16.03, the provisions of Section 16.06 shall prevail. This Section 16.03 shall survive the expiration or earlier termination of this Lease.

16.04. Tenant's Insurance. Tenant shall purchase, at its own expense, and keep in force at all times during the Lease Term the policies of insurance set forth below (collectively, "**Tenant's Policies**"). All Tenant's Policies shall (a) be issued by an insurance company with a Best 's rating of A or better and otherwise reasonably acceptable to Landlord and shall be licensed to do business in the state in which the Premises is located; (b) provide that said insurance shall not be canceled or materially modified unless thirty (30) days' prior written notice shall have been given to Landlord; (c) provide for deductible

amounts that are reasonably acceptable to Landlord (and its lender, if applicable); (d) be written as primary policy coverage and not "excess over" or contributory with any other applicable insurance; and (e) otherwise be in such form, and include such coverage, as Landlord may reasonably require. Tenant shall purchase and maintain, throughout the Term, a Tenant's Policy(ies) of: (i) commercial general or excess liability insurance, including personal injury and property damage, in the amount of not less than $1,000,000.00 per occurrence,   $2,000,000.00 annual general aggregate and $5,000,000 umbrella liability coverage; (ii) commercial property insurance covering Tenant's Property (at its full replacement cost); (iii) applicable workers compensation insurance in compliance with all applicable laws and regulations; and (iv) required pursuant to applicable laws and regulations or would be warranted pursuant to reasonable commercial principles.

16.05. <u>Landlord's Insurance</u>.  During the Lease Term, Landlord shall maintain the following types of insurance, the cost of which shall be included in Operating Expenses: (a) a commercial property insurance policy covering the Premises (at its full replacement cost), but excluding Tenant's Property; (b) commercial general public liability insurance covering Landlord for claims arising out of liability for bodily injury, death, personal injury, advertising injury and property damage occurring in and about the Premises or Common Areas and otherwise resulting from any acts or omissions of Landlord, its agents and employees; (c) rent loss insurance; and (d) any other insurance coverage deemed appropriate by Landlord or required by Landlord 's lender. All of the coverages described in (a) through (d) shall be determined from time to time by Landlord, in its sole discretion. All insurance maintained by Landlord shall be in addition to and not in lieu of the insurance required to be maintained by the Tenant.

16.06. <u>Waiver of Subrogation</u>. Notwithstanding anything contained in this Lease to the contrary, Tenant hereby waives any rights it may have against Landlord on account of any loss of or damage to its property, the Premises, its contents, or other portions of the Facility or Common Areas arising from any risk which is required to be insured against by <u>Sections 16.04</u> above. The special form coverage insurance policies maintained by Tenant as provided in this Lease shall include an endorsement containing an express waiver of any rights of subrogation by the insurance company against Landlord.

17.  **General Indemnification**. Tenant shall protect, defend, indemnify and hold Landlord's Indemnitees harmless, and defend them against, any and all claims arising from: (a) the authorized or unauthorized use of any of Landlord's or Americold's Equipment by Tenant, its employees, agents, contractors or invitees, (b) the occupancy, maintenance or use of the Premises, Common Areas or Facility by Tenant, its employees, agents, contractors or invitees, including ingress and egress thereto, (c) or relating to any of Tenant's Property, (d) the breach or default in the performance of any obligation on Tenant's part to be performed under the provisions of this Agreement, (e) any act, omission, negligence, gross negligence or willful misconduct of Tenant, its employees, agents, contractors, customers or invitees in or about the Premises and the Facility, (f) any act or occurrence within the Premises in all such cases; and (g) any and all costs, including reasonable attorneys' fees, expenses and liabilities incurred in the defense of any such any action or proceeding with respect to any claim involving items (a) through (g). The provisions of this <u>Section 17</u> shall survive the expiration or earlier termination of this Agreement.

18. **Exemption of Landlord from Liability**. Tenant hereby agrees that Landlord and Landlord's

12

Indemnitees will not be liable for consequential, incidental, punitive or other special damages (including, without limitation, injury to Tenant's business or any loss of income therefrom), or for any damage to Tenant's goods, merchandise or other personal property of Tenant, its employees, agents, contractors or invitees, or any other person in or about the Premises or elsewhere, or for any injury to Tenant, its employees, agents, contractors or invitees from any cause including specifically Landlord's negligence, whether such damage or injury results from conditions arising upon the Premises or in the Facility, the ingress or egress thereto, or from other sources or places. The provisions of this Section 18 shall survive the expiration or earlier termination of this Agreement.

19. **Refrigeration Breakdown.** Notwithstanding anything herein to the contrary, neither Landlord nor Americold Logistics, LLC shall be responsible for any injury or loss or damage to Tenant's products, other personal property or any interruption to Tenant's business due to a breakdown in, or ammonia leak from or interruption of service of the refrigeration system.

20. **Casualty and Condemnation; Eminent Domain.**

a. Should all or a material portion of the Facility or the Premises be damaged by fire or other casualty (excluding any casualty resulting from Tenant's acts, omissions, negligence, gross negligence, willful misconduct or breach of its obligations hereunder) so as to render the same reasonably unusable, this Agreement shall terminate as of the date of the casualty unless Landlord notifies Tenant, no more than thirty (30) days following the date of the casualty, of Landlord's intention to restore the damaged portions of the Facility within a reasonable time after such fire or casualty, which shall not exceed one hundred eighty (180) days from the date of the casualty. If Landlord elects not to terminate the Agreement and restores the Facility, then the Rent shall be abated for the period following the casualty during which the Premises is not usable by Tenant for the permitted use hereunder.

Should a portion of the Premises be damaged as set forth above, so as to render only a portion of the Premises unusable, and should Landlord not elect to terminate this Agreement as set forth above, then Tenant shall continue to use that portion of the Premises not damaged; provided, however, that the Rent shall be abated in proportion to the percentage of the Premises that is unusable, until such time as the damaged portion of the Premises is again usable or used by Tenant. Tenant hereby waives the provision of any statute or other law that may be in effect at the time of a casualty under which this Agreement is automatically terminated or pursuant to which Tenant would have any right to terminate this Agreement by reason of such event of casualty.

b. If all or any substantial part of the Facility or Common Areas shall be acquired by the exercise of eminent domain, Landlord may terminate this Lease by giving written notice to Tenant on or before the date possession thereof is so taken. If all or any part of the Premises shall be acquired by the exercise of eminent domain so that the Premises shall become impractical for Tenant to use for the Permitted Use, Tenant may terminate this Lease by giving written notice to Landlord as of the date possession thereof is so taken. All damages awarded shall belong to Landlord; provided, however, that Tenant may claim dislocation damages if such amount is not subtracted from Landlord's award.

21. **Inspection.** Landlord shall have the right to enter the Premises at any and all times for the

13

purposes of examination and inspection or to perform any repairs or maintenance to the Premises pursuant to Section 9 hereof or as Landlord may deem necessary or proper for the safety, improvement or preservation of the Premises or the Facility, or as may be required by law. Any such re-entry shall not constitute an eviction, nor entitle Tenant to any abatement, set off, withholding or diminution of Rent. In exercising its rights set forth in this Section 21, Landlord agrees to use good faith efforts not to unreasonably interfere with Tenant use and enjoyment of the Premises.

22. **Surrender.**  On or before the expiration or earlier termination of this Agreement, Tenant shall quit and surrender the Premises peacefully to Landlord in the condition the Premises were in upon commencement of this Agreement, broom clean, damage by reasonable wear and tear excepted except as otherwise set forth herein. All of Tenant's property that is not removed on or before the expiration or earlier termination of this Agreement shall be conclusively deemed to be abandoned by Tenant and, in addition to Landlord's remedies set forth in Section 23 below, Landlord shall be entitled to remove such remaining property, including but not limited to, trade fixtures, equipment and inventory, at Tenant's expense. All such property shall, at Landlord's option, become the property of Landlord, or said property may be placed in storage at Tenant's cost and expense, or sold or otherwise disposed of, in which event the proceeds of such sale or other disposition shall belong to Landlord.

b.  In the event Tenant fails or refuses to so surrender the Premises on the expiration or earlier termination of the Term, Tenant shall be deemed a tenant at sufferance at two hundred percent (200%) of the Rent for the Premises in effect on the date of such expiration or earlier termination, and Landlord shall be entitled to all rights and remedies available in accordance with applicable law (including, without limitation, the right to re-enter the Premises and remove Tenant and Tenant's products and personal property, by force if necessary). Tenant shall be responsible to Landlord for any and all damages, expenses and attorneys' fees incurred by Landlord with respect thereto. Acceptance by Landlord of Rent after such expiration or earlier termination shall not result in a renewal of this Lease, nor shall such acceptance create a month to month tenancy. This Section 22 shall in no way constitute a consent by Landlord to any holding over by Tenant, nor limit Landlord's remedies in such event.

23.    **Default and Remedies.**

23.01. Default. The occurrence of any of the following shall be a **"Default"**:

(a)   Tenant fails to pay any Monthly Minimum Rent Installments or Additional Rent within five (5) days after the same is due.

(b)   Tenant fails to perform or observe any other term, condition, covenant or obligation required under this Lease for a period of thirty (30) days after written notice thereof from Landlord.

(c)   Tenant shall vacate or abandon the Premises, or fail to occupy the Premises or any substantial portion thereof for a period of fifteen (15) days.

14

(d)      Tenant shall assign or sublet all or a portion of the Premises in contravention of the provisions of Section 26 of this Lease.

(e)      All or substantially all of Tenant's assets in the Premises or Tenant's interest in this Lease are attached or levied under execution (and Tenant does not discharge the same within sixty (60) days thereafter); a petition in bankruptcy, insolvency or for reorganization or arrangement is filed by or against Tenant (and Tenant fails to secure a stay or discharge thereof within sixty (60) days thereafter); Tenant is insolvent and unable to pay its debts as they become due; Tenant makes a general assignment for the benefit of creditors; Tenant takes the benefit of any insolvency action or law; the appointment of a receiver or trustee in bankruptcy for Tenant or its assets if such receivership has not been vacated or set aside within thirty (30) days thereafter; or, dissolution or other termination of Tenant's corporate charter if Tenant is a corporation.

In addition to the Defaults described above, the parties agree that if Tenant receives written notice of a violation of the performance of any (but not necessarily the same) term or condition of this Lease three (3) or more times during any twelve (12) month period, regardless of whether such violations are ultimately cured, then such conduct shall, at Landlord's option, represent a separate Default.

23.02.  Remedies.  Upon the occurrence of any Default, Landlord shall have the following rights and remedies, in addition to those stated elsewhere in this Lease and those allowed by law or in equity, any one or more of which may be exercised without further notice to Tenant:

(a)  Landlord may re-enter the Premises and cure any Default of Tenant, and Tenant shall reimburse Landlord as Additional Rent for any costs and expenses which Landlord thereby incurs; and Landlord shall not be liable to Tenant for any loss or damage which Tenant may sustain by reason of Landlord's action.

(b)   Without terminating this Lease, Landlord may terminate Tenant's right to possession of the Premises, and thereafter, neither Tenant nor any person claiming under or through Tenant shall be entitled to possession of the Premises, and Tenant shall immediately surrender the Premises to Landlord, and Landlord may re-enter the Premises and dispossess Tenant and any other occupants of the Premises by any lawful means and may remove their effects, without prejudice to any other remedy that Landlord may have. Upon termination of possession, Landlord may (i) re-let all or any part thereof for a term different from that which would otherwise have constituted the balance of the Lease Term and for rent and on terms and conditions different from those contained herein, whereupon Tenant shall be immediately obligated to pay to Landlord an amount equal to the present value (discounted at the prime rate of interest as reported in the Tuesday edition of the Wall Street Journal of the week in which the Default occurred) of the difference between the rent provided for herein and that provided for in any lease covering a subsequent re-letting of the Premises, for the period which would

15

otherwise have constituted the balance of the Lease Term (the **"Accelerated Rent Difference"**), or (ii) without re-letting, declare to be immediately due and payable the difference between the present value (discounted at the prime rate of interest as reported in the Tuesday edition of the Wall Street Journal of the week in which the Default occurred) of all rent which would have been due under this Lease for the balance of the Lease Term to be immediately due and payable as liquidated damages (the "Accelerated Rent") and the fair market rental value of the Premises for the same period of time (the "Fair Market Rental"), as determined by an appraiser selected by Landlord, based upon recently completed comparable lease transactions in Pendergrass, GA and the surrounding area in which the Premises is located (such difference being referred to as the **"Accelerated Fair Market Difference"**). Upon termination of possession, Tenant shall be obligated to pay to Landlord (A) the Accelerated Rent Difference or the Accelerated Fair Market Difference, whichever is applicable, (B) all loss or damage that Landlord may sustain by reason of Tenant's Default ("Default Damages"), which shall include, without limitation, expenses of preparing the Premises for re-letting, demolition, repairs, brokers' commissions and attorneys' fees, and (C) all unpaid Minimum Annual Rent and Additional Rent that accrued prior to the date of termination of possession, plus any interest and late fees due hereunder (the "Prior Obligations").

(c) Landlord may terminate this Lease and declare the Accelerated Rent Difference or the Accelerated Fair Market Difference, whichever is applicable, to be immediately due and payable, whereupon Tenant shall be obligated to pay to Landlord (i) the Accelerated Rent Difference or the Accelerated Fair Market Difference, whichever is applicable, (ii) all of Landlord's Default Damages, and (iii) all Prior Obligations. It is expressly agreed and understood that all of Tenant's liabilities and obligations set forth in this subsection (c) shall survive termination.

(d) Landlord and Tenant acknowledge and agree that the payment of the Accelerated Rent Difference or the Accelerated Fair Market Difference as set forth above shall not be deemed a penalty or forfeiture, but merely shall constitute payment of liquidated damages, it being understood that actual damages to Landlord are extremely difficult, if not impossible, to ascertain. Neither the filing of a dispossessory proceeding nor an eviction of personalty in the Premises shall be deemed to terminate the Lease.

(e) Landlord may sue for injunctive relief or to recover damages for any loss resulting from the Default.

23.03. **Landlord's Default and Tenant's Remedies.** Landlord shall be in default if it fails to perform any material term, condition, covenant or obligation required under this Lease for a period of thirty (30) days after written notice thereof from Tenant to Landlord; provided, however, that if the term, condition, covenant or obligation to be performed by Landlord is such that it cannot reasonably be performed within thirty (30) days, such default shall be deemed to have been cured if Landlord commences such performance within said thirty-day period and thereafter diligently undertakes to complete the same. Upon the occurrence of any such default, Tenant may, as its sole and exclusive remedies, either sue for injunctive relief or seek specific performance. In no event shall Tenant be

16

entitled to terminate this Lease or withhold, offset or abate any sums due hereunder.

24. **Landlord's Right to Relocate.** Landlord shall have the right upon at least thirty (30) days' prior written notice to Tenant to relocate Tenant and to substitute for the Premises other space in the Facility. Landlord shall improve such substituted space, at its expense, with improvements at least equal in quantity and quality to those in the Premises. In no event shall Landlord be liable to Tenant for any consequential or special damages as a result of any such relocation, including, but not limited to, loss of business income or opportunity.

25. **Non-Waiver.** Neither party's failure or delay in exercising any of its rights or remedies or other provisions of this Lease shall constitute a waiver thereof or affect its right thereafter to exercise or enforce such right or remedy or other provision. No waiver of any default shall be deemed to be a waiver of any other default. Landlord's receipt of less than the full rent due shall not be construed to be other than a payment on account of rent then due, nor shall any statement on Tenant's check or any letter accompanying Tenant's check be deemed an accord and satisfaction. No act or omission by Landlord or its employees or agents during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such a surrender shall be valid unless in writing and signed by Landlord.

26. **Assignment.**

(a) Tenant shall not assign this Agreement or sublet the Premises, or any portion thereof, without obtaining the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion. Any transfer requested by Tenant shall be submitted in writing to Landlord with all supporting documents requested by Landlord and a $5,000.00 review fee, which shall be due and earned whether or not Landlord consents to such Tenant requested transfer. Any consent given by Landlord on one occasion shall not be deemed consent to any subsequent assignment. Any purported assignment or subletting in violation of this provision shall be considered a default by Tenant, shall be given no force or effect, and Tenant shall be responsible for any acts or liabilities attributable to the purported assignee or subtenant. No assignment by Tenant shall release Tenant from any liability hereunder, and Tenant shall remain primarily liable for the performance of all Tenant obligations in this Agreement. The acceptance of Rent from any party other than Tenant shall not be deemed a waiver of any of the provisions of this Agreement nor shall it be deemed a consent to any assignment.

(b) Landlord shall have the right to sell all or a portion of the Premises, the Facility and the land on which they are located at any time, subject only to the rights of Tenant hereunder; and Landlord may sell or assign its rights as Landlord hereunder, and such sale or assignment shall operate to release Landlord from liability hereunder after the date of such conveyance or assignment.

27. **Notices:** All notices and demands which may or are required or permitted to be given by either party to the other hereunder shall be in writing and shall be sent by United States Mail, postage prepaid, by a nationally recognized courier (with confirmation of receipt) to the appropriate party at its address set forth below. Notice shall be effective when actually received by the receiving party.

If to Landlord:   c/o Americold Logistics, LLC
         Attn.: Real Estate Director
         10 Glenlake Parkway, South Tower
         Suite 600
         Atlanta, Georgia 30328

If to Tenant:    Signature Pack, LLC
         Attn: Lee Turner, CFO
         5786 Highway 129 North
         Suite N
         Pendergrass, GA 30567

Either Landlord or Tenant may from time to time designate a different address for future notice by providing written notice pursuant to the terms of this Section 27.

  28. **Attorneys' Fees**: If any dispute arises in connection with the interpretation or enforcement of this Agreement or any default hereunder, or if Landlord or Tenant is required to appear in any legal proceeding with regard to this Agreement, the prevailing party in any such dispute shall be entitled to recover from the non-prevailing party all reasonable attorneys' fees, costs, disbursements and other expenses actually incurred.

  29. **Subordination**: Tenant understands and agrees that this Agreement is subject to all easements, restrictions, rights of way, covenants, conditions, reservations and exceptions presently existing or hereinafter encumbering the Premises or the Facility, and shall be subject and subordinate to any master lease and /or liens of any and all mortgages, deeds of trust or other security interest existing now or in the future placed on or against the Premises or the Facility. Tenant further agrees to execute and deliver, at no expense to Landlord, upon request at any time, additional instruments confirming the subordination of this Agreement to any lease, mortgage, deed of trust or other such instrument. So long as Tenant is not in default under any term of this Agreement, Landlord shall use commercially reasonable efforts to assure that any master landlord, mortgagee, mortgagee's beneficiary or encumbrance holder shall agree to recognize the term of this Agreement and not to disturb the tenancy created hereby.

  30. **Estoppel Certificate**. Within ten (10) days following receipt of a written request from Landlord, Tenant shall execute and deliver to Landlord, without cost to Landlord, an estoppel certificate in such form as Landlord may reasonably request certifying (a) that this Rental Agreement is in full force and effect and unmodified or stating the nature of any modification, (b) the date to which rent has been paid, (c) that there are not any uncured defaults or specifying such defaults if any are claimed, and (d) any other matters or state of facts reasonably required respecting the Rental Agreement. Such estoppel may be relied upon by Landlord and by any purchaser or mortgagee of the Premises or Facility.

  31. **Limitation of Landlord's Liability**. NOTWITHSTANDING ANYTHING TO THE CONTRARY, LANDLORD'S ENTIRE LIABILITY FOR ANY CLAIMS, DAMAGES OR LOSSES ARISING FROM OR RELATED TO THIS LEASE SHALL BE LIMITED TO THE

18

AMOUNT OF MINIMUM ANNUAL RENT ACTUALLY PAID BY TENANT OVER THE PRECEDING TWENTY-FOUR (24) MONTH PERIOD. IF LANDLORD SHALL FAIL TO PERFORM ANY TERM, CONDITION, COVENANT OR OBLIGATION REQUIRED TO BE PERFORMED BY IT UNDER THIS RENTAL AGREEMENT AND IF TENANT SHALL, AS A CONSEQUENCE THEREOF, RECOVER A MONEY JUDGMENT AGAINST LANDLORD, TENANT AGREES THAT SUCH JUDGMENT SHALL BE SATISFIED SOLELY OUT OF LANDLORD'S RIGHT, TITLE AND INTEREST IN AND TO THE PREMISES. TENANT FURTHER AGREES THAT NO OTHER ASSETS OF LANDLORD, OR OF ANY OWNER, PARTNER, MEMBER OR MANAGER IN OR OF LANDLORD, SHALL BE SUBJECT TO LEVY, EXECUTION OR OTHER PROCESS FOR THE SATISFACTION OF TENANT'S JUDGMENT.

32. **Force Majeure.** Landlord and Tenant (except with respect to the payment of any monetary obligation) shall be excused for the period of any delay in the performance of any non- monetary obligation hereunder when such delay is occasioned by causes beyond its control, including, but not limited to, fire, earthquakes, floods, war, national emergency, epidemics, acts of God, terrorist activity, insurrection, riot, strike, lockout, slowdowns, or other industrial disputes and/or work stoppages, robbery, hijack, unavailability of communications or electrical power service provided by third parties, shortages of materials equipment or labor, government regulations superimposed after the fact, or acts of government including delay.

33. **Entire Agreement.** This Agreement contains all agreements of the parties with respect to the use and rental of the Premises. This Agreement may be modified in writing only, signed by the parties in interest at the time of modification.

34. **Governing Law.** Validity and construction of this Agreement shall be governed by the laws of the state where the Facility is located and may be enforced against any of the parties hereto in the courts of such state, the parties hereby submitting themselves to the jurisdiction of such courts. **THE PARTIES WAIVE TRIAL BY JURY IN ANY SUCH ACTION(S) AND CONFIRM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THEIR BUSINESS TRANSACTIONS.** For any such action(s) related to their business transactions or enforcement of any arbitration, the Parties submit themselves to the jurisdiction of the state or federal courts located in the jurisdiction where the Facility is located.

35. **Recording.** Neither this Agreement nor any memorandum thereof may be recorded in the public records of the county in which the Facility is located without the prior written consent of Landlord.

36. **Time is of the Essence.** Time is of the essence of this Agreement, and of each provision hereof.

37. **No Agency.** In no event shall Tenant be deemed an agent or employee of Landlord and in no event shall Landlord be deemed an agent or employee of Tenant.

38. **Construction.** Each party and its attorneys have reviewed and revised this Agreement and the normal rule of construction to the effect that any ambiguities are resolved against the drafting party

19

shall not be employed in the interpretation of this Agreement.

39. **Authority.** Each person executing this Agreement on behalf of the respective party hereto represents and warrants that such party is duly organized and validly existing and that this Agreement has been authorized by all necessary parties and is being validly executed by an authorized officer of such party and is binding upon and enforceable against such party in accordance with the terms hereof.

40. **Counterparts.** This Agreement may be executed in counterparts, including by means of facsimile signature pages, any of which need not contain the signature of more than one party and each of which shall be deemed an original.

41. **Severability.** Any term or provision of this Agreement which is invalid or unenforceable shall be ineffective only to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or other provisions of this Agreement.

42. **Confidentiality.** Each party further agrees that any information given to it or acquired by it with respect to the other party's business which is confidential in nature including, without limitation, information concerning the operations, techniques, trade secrets, processes and formulae of the other party, shall not be used by the receiving party or disclosed to others by the receiving party for any purpose whatsoever without the prior written consent of the disclosing party. Information shall not be deemed "confidential" for purposes of the preceding sentence if such information (a) is or becomes generally available to the public (other than as a result of a disclosure by or through the receiving party in violation of this provision), (b) is disclosed to the receiving party from a third party not bound by any legal, contractual or other obligation prohibiting or limiting the disclosure of such information by such third party, or (c) is required by law to be disclosed by the receiving party (such disclosure not to be effected until (1) the receiving party receives written advice from its legal counsel that it must disclose such information to comply with applicable law; and (2) the receiving party promptly notifies the disclosing party of the requirement so that the receiving party may seek a protective order or other appropriate remedy). For purposes hereunder, the party that receives any confidential information of the other party shall be deemed to be the **"receiving party"** and the party that discloses or makes available its confidential information shall be deemed the **"disclosing party"**.

43. **Examination of Agreement**. Submission of this instrument by Landlord to Tenant for examination or signature does not constitute an offer by Landlord to lease the Premises. This Agreement shall become effective, if at all, only upon the execution by and delivery to both Landlord and Tenant. Execution and delivery of this Agreement by Tenant to Landlord constitutes an offer to lease the Premises on the terms contained herein.

44. **Effective Date**. This Agreement shall be effective as of July 1, 2018.

[SIGNATURES FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

**TENANT:**

Signature Pack, LLC

By: _____
Name: _THOMAS SOUTHWORTH_
Title: _MANAGER_
Date: _10-26-2018_

**LANDLORD:**

Versacold USA, Inc.

By: _____
Name: _David K Stuver_
Title: _EVP of BD + SCS_
Date: _11/13/18_



Exhibit A

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on this day the foregoing *Motion to Assume Non-Residential Real Property Lease for Property Located at 86 Jackson Concourse, Pendergrass, Jackson County, Georgia* (the "Motion") was electronically filed using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of and an accompanying link to the Motion to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing Program:

- **Griffin B. Bell**    gbb@gb3pc.com, dts@gb3pc.com;admin@gb3pc.com
- **Frederic S. Beloin**    fbeloin@beloinlaw.com, jkuhar@beloinlaw.com
- **Sam G. Bratton**    sbratton@dsda.com, kstratton@dsda.com;dbkirk@dsda.com
- **David A. Garland**    dgarland@mcdr-law.com, dgarland@mcdr-law.com;hjohnson@mcdr-law.com
- **Lee B. Hart**    lee.hart@nelsonmullins.com, ayo.uboh@nelsonmullins.com
- **Sean C. Kulka**    sean.kulka@agg.com
- **Leah Fiorenza McNeill**    Leah.Fiorenza@bclplaw.com, b.lyle@bclplaw.com
- **Office of the United States Trustee**    ustpregion21.at.ecf@usdoj.gov
- **Stephan A. Ray**    sray@mcdr-law.com, hjohnson@mcdr-law.com
- **Michael D. Robl**    michael@roblgroup.com
- **Andres H. Sandoval**    andres.sandoval@usdoj.gov, charlie.cromwell@usdoj.gov;Larissa.selchenkova@usdoj.gov
- **Shayna M. Steinfeld**    shayna@steinfeldlaw.com
- **Thomas R. Walker**    thomas.walker@fisherbroyles.com
- **David S. Weidenbaum**    david.s.weidenbaum@usdoj.gov
- **David A. Wender**    david.wender@alston.com

I further certify that the Motion was served on all parties referenced below via the method indicated.

**Via Certified Mail/Return Receipt Requested and U.S. First Class Mail:**
Versacold USA, Inc.
c/o Americold Logistics, LLC
Attn: Real Estate Director
10 Glenlake Parkway,
South Tower, Suite 600
Atlanta, GA 30328

**Via Certified Mail/Return Receipt Requested and U.S. First Class Mail:**
Versacold USA, Inc.
c/o Americold Logistics, LLC
Attn: General Counsel
10 Glenlake Parkway,
South Tower, Suite 600
Atlanta, GA 30328

**Via Certified Mail/Return Receipt Requested and U.S. First Class Mail:**
Byung J. Park, US Attorney
600 Richard B. Russell Building
75 Ted Turner Drive, SW
Atlanta, GA 30303-315

**Via Certified Mail/Return Receipt Requested and U.S. First Class Mail:**
Christopher Carr
Attorney General of Georgia
40 Capitol Square SW
Atlanta, GA 30334-9057

**Via Certified Mail/Return Receipt
Requested and U.S. First Class Mail:**
Jackson Co. Tax Assessor
67 Athens Street
Jefferson, GA 30549-1401

**Via Certified Mail/Return Receipt
Requested and U.S. First Class Mail:**
Jeff McClain, Tax Commissioner
Ohio Department of Taxation
4485 Northland Ridge Blvd
Columbus, OH 43229-6596

**Via Certified Mail/Return Receipt
Requested and U.S. First Class Mail:**
Lynne Riley
State of Georgia Revenue Commissioner
1800 Century Blvd, NE
Atlanta, GA 30345-3202

**Via Certified Mail/Return Receipt
Requested and U.S. First Class Mail:**
Renasant Bank
Attn: Ken Davis, Registered Agent
275 S Main Street
Alpharetta, GA 30009-1937

**Via U.S. First Class Mail:**
Ambassador Sanitation Mngmnt
P.O. Box 2057
Thomasville, GA 31799

**Via U.S. First Class Mail:**
American Express Corporate Card
P.O. Box 1270
Newark, NJ 07101

**Via U.S. First Class Mail:**
Americold
25586 Network Place
Chicago, IL 60673

**Via U.S. First Class Mail:**
Champion Foods, Inc.
Wallace, Jordan, Ratliff & Brandt, LLC
800 Shades Creek Parkway, Suite 400
Birmingham, AL 35209-4518

**Via U.S. First Class Mail:**
Family Dollar Services, LLC
c/o Marc Metcalf
Sr. Counsel, Commercial & General
Litigation
500 Volvo Parkway
Chesapeake, VA 23320-1604

**Via U.S. First Class Mail:**
Genesis Baking Company
211 Woodlawn Avenue
Norwalk, OH 44857

**Via U.S. First Class Mail:**
S.E. Meats, Inc.
Marc P. Solomon
Burr & Forman LLP
420 N 20th St, Ste 3400
Birmingham, AL 35203

**Via U.S. First Class Mail:**
Kudzu Valley Farm
P.O. Box 922
Oakwood, GA 30566

**Via U.S. First Class Mail:**
Linde LLC
88718 Expedite Way
Chicago, IL 60695

**Via U.S. First Class Mail:**
M&J Foods
Attn: Michael Zimmer, Registered Agent
1289 Bennett Pl
The Villages, FL 32162

**Via U.S. First Class Mail:**
Messer LLC
88718 Expedite Way
Chicago, IL 60695

**Via U.S. First Class Mail:**
Monogram Food Solutions, LLS
P.O. Box 71400
Chicago, IL 60694

**Via U.S. First Class Mail:**
Penobscot McCrum LLC
Anthony J. Manhart, Esq.
Preti Flaherty, LLP
P.O. Box 9546
Portland, ME 04112-9546

**Via U.S. First Class Mail:**
Pilgrim's Pride Corporation
P.O. Box 809225
Chicago, IL 60680

**Via U.S. First Class Mail:**
JSO Associates Inc.
17 Maple Drive
Great Neck, NY 11021

**Via U.S. First Class Mail:**
Seabrook Brothers & Sons
P.O. Box 781405
Philadelphia, PA 19178

**Via U.S. First Class Mail:**
Southeastern Paper Co.
P.O. Box 890671
Charlotte, NC 28289

**Via U.S. First Class Mail:**
Southern Food Broker
Attn: Lance Watkins
196 Bruce Etheredge Parkway
Pell City, AL 35128

**Via U.S. First Class Mail:**
TNT
701 Industrial Drive
Perryvilla, MO 63775

**Via U.S. First Class Mail:**
Wilheit Packaging, LLC
P.O. Box 111
Gainesville, GA 30503

This 4th day of December, 2019

**JONES & WALDEN, LLC**

*/s/ Leslie M. Pineyro*
Leslie M. Pineyro
Georgia Bar No. 969800
21 Eighth Street NE
Atlanta, Georgia 30309
(404) 564-9300 Telephone
(404) 564-9301 Facsimile
lpineyro@joneswalden.com

8