# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

IN RE:

**SIGNATURE PACK, LLC,**

      **Debtor.**

**CHAPTER 11**

**CASE NO.   19-20916-JRS**

### MOTION OF THE DEBTOR FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 APPROVING (A) ASSET PURCHASE AGREEMENT AND (B) SALE OF CERTAIN ASSETS TO VISIONARY FOODS LLC

Signature Pack, LLC ("Debtor" or "Seller") files this motion (the "Sale Motion") for entry of an order approving (i) that certain Asset Purchase Agreement as hereinafter described to be used in connection with the proposed sale of certain assets comprising the part of Debtor's business involving the packing and sale of chicken wings as further defined in the Asset Purchase Agreement (the "Wing Business" or the "Business"), and (ii) approving the sale by the Debtor of the Assets, as defined below, to Visionary Foods, LLC (the "Buyer"). In support of this Sale Motion, the Debtor respectfully show the Court as follows:

#### Jurisdiction

1.    This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

#### Background

2.    Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 5, 2019 (the "Petition Date").

3.     Debtor has continued in possession of its property and has continued to operate and manage its business as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.     Debtor has engaged the services of James B. Ardrey ("Advisor"), as approved by the Court (Doc. No. 116), as its advisor to assist in the sales process.  Advisor has contacted and has been contacted by multiple interested parties since the Petition Date.  Based on Debtor's and Advisor's knowledge of the industry, Debtor and Advisor believe that they have solicited an offer for the Assets, as defined below, from all of the individuals or entities who Debtor and Advisor believe are likely to have interest in these assets. Debtor and Advisor believe the sale of the Wing Business as contemplated in the Asset Purchase Agreement constitutes the best way to maximize value of these assets for this Estate and Debtor's creditors.

6.     Accordingly, Debtor proposes to effectuate the sale of all of its assets involved in its Wing Business (the "Sale") which include, without limitation, all of Debtor's direct and indirect right, title and interest in and to the certain assets as defined in the Asset Purchase Agreement (collectively, the "Assets") for the Purchase Price of $1,750,000.00 (as further described in the APA). Notwithstanding anything to the contrary herein, such Assets shall not include the Excluded Assets, as defined in the APA.

7.     Renasant Bank ("Renasant") holds a first priority lien upon and security interest in the Assets.  Renasant asserts that, as of August 9, 2019, the total secured debt owed to Renasant by Debtor was at least $1,358,578.82 (including all principal and interest). Debtor has paid at least $392,013.64 to Renasant since the Petition Date on its secured debt and Debtor's co-obligors on said secured indebtedness have paid additional monies to Renasant since the Petition Date.

8.      The Debtor, in consultation with the Advisor and after contacting numerous potential purchasers of the Wing Business, has determined that the Sale of the Assets to Buyer pursuant to the Asset Purchase Agreement ("APA[1]") attached hereto as <u>Exhibit A</u> is the best method for achieving the highest sale price for the Assets.

9.      The Debtor believes that the proposed sale as provided in the APA (the "Proposed Sale") offers the best opportunity for the Debtor to maximize the value of the Business and the Assets for the benefit of its estate following reasonable and appropriate marketing efforts and, therefore, the Debtor believes that the Proposed Sale is in the best interests of the estate herein, and should be approved.

### <u>Relief Requested</u>

11.     By this Sale Motion, the Debtor requests that the Court enter an order approving the Sale and making the following findings and determinations, among others, with respect to such Sale:

(i)      The APA and the transactions contemplated thereby are approved;

(ii)     The Buyer shall have and acquire at the Closing good, valid and marketable title to the Assets and the Assets shall be sold and conveyed to Buyer free and clear of any and all liens, claims, encumbrances and other interests, except for any liabilities that may be assumed pursuant to the terms of the APA;

(iii)    Debtor shall assume and assign to Buyer all of the Contracts designated by Buyer to be assigned to Buyer at Closing as of the date of Closing (such Contracts, the "Assigned Contracts");

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to the same in the APA.

(iv)     Buyer shall, on or before the Closing, pay or otherwise satisfy the cure costs to the appropriate parties as ordered by the Court so as to permit the assumption and assignment of all Assigned Contracts;

(v)     the Assigned Contracts shall be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, among other things, defaults, breaches or claims of pecuniary losses existing as of the closing or by reason of the Closing;

(vi)     Buyer is acquiring the Assets "as-is";

(vii)     Buyer shall be found to be a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code; and

(viii)     the Court shall waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Bankruptcy Rules 6004(h) and 6006(d).

(ix)     The transfer of the Assets is a transfer pursuant to Section 1146(c) of the Bankruptcy Code, and accordingly, the transfer of the Assets (including without limitation, both real and personal property) to Buyer does not and will not subject the Debtor or Buyer, their respective affiliates, or designees to any liability for any documentary, transfer, stamp, sales, use or similar tax or any so-called "bulk-sale," to the fullest extent permitted by Section 1146(c) of the Bankruptcy Code. Each and every federal, state, and local government agency or department that was served with the Sale Motion or notice thereof is directed to accept any and all documents and instruments necessary and appropriate to consummate the transfer of any of the Assets, all without imposition or payment of any stamp tax, transfer tax, or similar

4

tax.

(x)    Notwithstanding anything to the contrary in the Sale Order or otherwise, and pursuant to the order authorizing the employment of James B. Ardrey (Doc. No. 116), Debtor shall be authorized to pay at Closing the $200,000 Sale Transaction Fee, (the "Ardrey Fee") directly to Ardrey out of the gross proceeds of the Purchase Price.

(xi)    Debtor shall be authorized to utilize the Sale Proceeds generated from the Purchase Price to pay obligations as follows:

(1) such amount as is necessary to pay off the Renasant secured claim;

(2) the Ardrey Fee;

(3) the amount necessary to pay off the JSO Settlement;

(4) Customary closing costs attributable to Debtor as seller; and

(5) All net proceeds remaining thereafter to be held in the IOLTA Trust Account of Debtor's counsel, Jones & Walden, LLC until further order of the Court.

(xii)  Any monies collected or received by Debtor from the Excluded Assets, including the collection of any accounts receivable, shall be paid to the IOLTA Trust Account of Debtor's counsel, Jones & Walden, LLC, for use in accordance with the terms of the Sale Order or until further order of the Court.

(xiii) The following items may be paid from funds collected by Debtor or held in trust in Jones & Walden, LLC's IOLTA Trust Account without further order of the Court:

(1)    Any quarterly fees due and payable to the United States Trustee;

5

(2)    Payroll for Debtor's payroll obligations incurred prior to the Closing and associated payroll taxes and benefits payments;

(3)    Any insurance that comes due regarding any Excluded Assets or otherwise necessary for the winding down of Debtor's operations, or amounts owed for insurance prior to the Closing; and

(4)    The amounts reasonably necessary for retention or hiring persons to finalize Debtor's books and records and assist in the winddown of Debtor's finances and business subject to the maximum gross amount of $2,500 per week for up to a total of $15,000.00, inclusive of employee payroll obligations, plus the associated amount of employer payroll obligations for such services.

(5)    Any amount necessary to destroy or dispose of any unusable or unserviceable product.

## Argument

12.    As stated above, Debtor believes that the Proposed Sale provides the Debtor with its best opportunity to preserve and maximize the value of the Business and the Assets for the benefit of its estate and, therefore, the Debtor believes that implementation of the Proposed Sale, and approval of any Sale that is presented in accordance therewith, is in the best interests of the Debtor's creditors, employees, estates and other stakeholders. As such, the Debtor submits that approval of this Sale Motion and the Proposed Sale is consistent with applicable law and should be granted.

A.    **Section 363(b) Authorizes the Proposed Sale and Sale Process.**

13.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, in applying this section, courts have required that it be based upon the sound business judgment of the debtor. See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented a good business reason to grant such application); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (same); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991); In re Phoenix Steel Corp, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a § 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith).

14.     Debtor respectfully submits that the Proposed Sale fits squarely within the parameters of the sound business judgment test articulated in the above-referenced authorities.

15.     First and foremost, Debtor has articulated a sound business purpose for the Proposed Sale. As set forth above, the Debtor, in order to monetize the Assets for distribution to creditors, and based on Debtor's and Advisor's knowledge of the industry, have solicited an offer for the Assets from all of the individuals or entities who Debtor and Advisor believe are likely to have interest in these assets. The Proposed Sale represents the best offer Debtor was able to procure based on these contacts and conversations.

16.     Debtor respectfully submits that the Proposed Sale is adequate, fair and represents

7

the highest price for the Assets, which have already been marketed at length since the bankruptcy filing through the efforts of the Advisor.

17.     As in the case of <u>Delaware & Hudson Ry. Co.,</u> the substantial solicitation and marketing efforts of Debtor supports the proposed process and the reasonableness of the offer presented by Buyer.

18.     Debtor submits that the terms of the APA and the underlying proposed transaction were negotiated and presented in good faith and at arm's length.  In connection therewith, the Debtor will be prepared to present further evidence of good faith during the course of the Sale Hearing that will satisfy this Court and the mandates of Section 363(m) of the Bankruptcy Code.

19. Debtor intends to give notice of the Sale Hearing and the proposed sale by the Debtor of the Assets, by mailing a copy of the Sale Motion (or Notice setting forth the terms of the Sale Motion), within two business days, to (i) counsel to Renasant; (ii) all entities having requested notices pursuant to Bankruptcy Rule 2002; (iii) the Office of United States Trustee for the Northern District of Georgia; (iv) all non-debtor parties to the executory contracts and unexpired leases to be assumed and assigned as part of the sale of the Business; and (vi) the creditors listed on Debtor's mailing matrix. (The persons listed in clauses (i) through (vi) are referred to collectively as the "Notice Parties"). The Debtor submits that the foregoing is sufficient notice of the Sale Hearing and the proposed sale by the Debtor of the Assets.

20.     By this Sale Motion, the Debtor intends to sell the Wing Business in order to monetize the Assets for distribution to its creditors. Debtor strongly believes that, in furtherance of this goal, it has done all that is reasonably possible to secure the highest or best possible offer for the Assets under the circumstances, and it believes that this sale must be consummated as promptly as practicable in order to prevent any erosion in value of the Assets, and Buyer requires

8

that an order authorizing the APA and Proposed Sale be entered by January 23, 2020, and the closing of the Proposed Sale occur no later than January 31, 2020. For all of the foregoing reasons, the relief requested in this Sale Motion is a product of sound business judgment and is in the best interests of Debtor, its creditors, employees, estate and other stakeholders, and should be granted.

21.    Accordingly, Debtor submits that the Proposed Sale Process, and any Sale presented in accordance therewith, is warranted and appropriate under the terms and provisions of Section 363(b) of the Bankruptcy Code.

**B.    Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

22.    Debtor requests that the sale and transfer of the Assets be approved free and clear of all Liens, other than those specifically assumed by Buyer. Such relief is consistent with the provisions of Section 363(f) of the Bankruptcy Code in this case.

23.    Section 363(f) provides that a debtor-in-possession may sell property free and clear of any lien, claim or interest of another entity in such property if any of the following circumstances pertain:

(1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

9

11 U.S.C. § 363(f).

24.     As indicated by the use of the disjunctive term "or," satisfaction of any one of the five requirements listed in Section 363(f) is sufficient to permit the sale of assets free and clear of liens. See In re Elliott, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that Section 363(f) is written in the disjunctive; the court may approve a sale "free and clear" provided that at least one of the subsections is met).

25.      In this instance, the Debtor believes that Renasant is the only entity holding or asserting a security interest in the Assets.  Debtor shows that Renasant's secured claim will be paid in full at a closing of the APA, and Debtor anticipates that Renasant will consent to the Proposed Sale. Accordingly, Bankruptcy Code Section 363(f)(2) will be satisfied.

26.     Debtor is not aware of any additional potentially asserted secured claims that would attach to the Assets.

27.     Debtor is simultaneously filing a "Motion for Entry of Order Permitting Debtor to Assume and Assign Trademark License Agreement Pursuant to 11 U.S.C. § 363" (the "TM Motion") seeking authority to assume and assign its Trademark Agreement with S.E. Meats, Inc. as licensor and Debtor as licensee for the use of certain trademarks owned by S.E. Meats, Inc. to Buyer at a closing of the APA. Debtor shows that it anticipates S.E. Meats, Inc. consenting to such assignment.

28.     Debtor is additionally simultaneously filing a Motion to Approve Settlement Agreement With JSO[2] (the "JSO Motion") seeking approval of the JSO Settlement Agreement regarding JSO's claims against Debtor pursuant to the Perishable Agricultural Commodities Act of 1930, 7 U.S.C.A. §499a *et seq.* ("PACA").

29.    Accordingly, the requirements of Section 363(f) of the Bankruptcy Code can be satisfied, and the sale of the Assets free and clear of all liens is appropriate.

**C.    Buyer Should Be Afforded All Protections Under Bankruptcy Code Section 363(m) as a Good Faith Purchaser.**

30.    Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith ..." 11 U.S.C. § 363(m).

31.    As discussed above, the Proposed Sale is the result of an arm's length negotiation with Buyer after contacting numerous potential purchasers of the Wing Business. Accordingly, the Debtor requests that Buyer be determined to have acted in good faith and be entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code. See, e.g., In re United Press Int'l. Inc., No. 91 B 13955 (FGC), 1992 U.S. Bankr. LEXIS 842, at *3 (Bankr. S.D.N.Y. May 18, 1992). In this regard, Buyer is a party with which Debtor has negotiated at arm's length and in good faith and Buyer will not have any relationship to the Debtor that has not been fully disclosed to the Court.[3]

**Notice**

32.    This Sale Motion will be served, and further notice of the Sale Hearing and the proposed sale by the Debtor of the Assets will be given, in accordance with the procedures set

---

[2] The JSO Motion seeks approval of the JSO Settlement as defined in the JSO Motion.

[3] Debtor discloses that Buyer has indicated it intends to continue a relationship with Charles McAtee post-closing. The relationship and its details have not been finalized but may include an equity component in Buyer. Charles McAtee currently serves as Debtor's Corporate Manager and oversees sales, interactions with customers, product development and day-to-day operations of the business. Debtor is owned 100% by Signature Food Marketing, LLC. Charles McAtee

forth above. The Debtor respectfully submit that such notice is sufficient and proper under the circumstances, and that no other or further notice is required.

WHEREFORE, based upon the foregoing, the Debtor respectfully requests that the Court enter the Sale Order following the Sale Hearing, (a) authorizing the execution of the APA, (b) approving the sale by the Debtor of the Assets to Buyer, (c) deeming order entered on this Sale Motion effective immediately upon the date of such order, and (d) granting such other and further relief as the Court deems just and proper. A proposed order granting the Sale Motion is attached to the APA, and Debtor respectfully requests all relief stated in the proposed order.

This 14th day of January 2020.

**JONES & WALDEN, LLC**
*/s/ Leslie M. Pineyro*
Leslie M. Pineyro
Georgia Bar No. 969800
Thomas T. McClendon
Georgia Bar No. 431452
Leon S. Jones
Georgia Bar No. 003980
Attorneys for Debtor
21 Eighth Street, NE
Atlanta, Georgia 30309
(404) 564-9300
lpineyro@joneswalden.com

---

owns 41.35% of Signature Food Marketing, LLC.

Exhibit "A"

**ASSET PURCHASE AGREEMENT**

between

**SIGNATURE PACK, LLC, seller**

and

**VISIONARY FOODS, LLC., Buyer**

dated as of

January 14, 2020

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*"), dated as of January 14, 2020, is entered into by and among **Visionary Foods, LLC.**, a Arkansas limited liability company ("**Visionary**" or "*Buyer*"), and Signature Pack, LLC, a Georgia limited liability company ("*Signature Pack*" or "*Seller*").

## RECITALS

**WHEREAS**, Signature Pack's business activities includes the business of selling, marketing and distributing individually quick-frozen wings and other chicken parts (the "*Wing Business*" or the "*Business*");

**WHEREAS**, Signature Food Marketing, LLC is the sole member of Signature Pack;

**WHEREAS**, Signature Pack filed a Chapter 11 voluntary bankruptcy petition on May 9, 2019, initiating Case No. 19-20916 pending in the Northern District of Georgia, Atlanta Division, in front of the Hon. James R. Sacca; and

**WHEREAS**, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, certain of the assets of the Business, subject to the terms and conditions set forth herein; and

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"*Action*" and "*Actions*" mean any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"*Affiliate*" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Allocation Schedule*" has the meaning set forth in Section 2.06.

2

"*Ancillary Documents*" means the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment, the License Agreement and the other agreements, instruments and documents required to be delivered at the Closing.

"*Assigned Contracts*" has the meaning set forth in Section 2.01(d).

"*Assignment and Assumption Agreement*" has the meaning set forth in Section 3.02(a)(ii).

"*Bankruptcy Court*" means the Bankruptcy Court for the Northern District of Georgia.

"*Bankruptcy Court Sale Hearing*" has means the hearing at which the Bankruptcy Court having jurisdiction over the Bankruptcy Case will decide whether to approve of this Agreement.

"*Bankruptcy Case*" means the Case No. 19-20916, concerning Signature Pack, pending before the Bankruptcy Court for the Northern District of Georgia.

"*Bill of Sale*" has the meaning set forth in Section 3.02(a)(i).

"*Business*" has the meaning set forth in the recitals.

"*Business Day*" means any day except Saturday, Sunday or any other day on which commercial banks located in Atlanta, Georgia are authorized or required by Law to be closed for business or a day recognized as a legal holiday by the District Court.

"*Buyer*" has the meaning set forth in the preamble.

"*Buyer Indemnitees*" has the meaning set forth in Section 7.01.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"*Closing*" has the meaning set forth in Section 3.01.

"*Closing Date*" has the meaning set forth in Section 3.01.

"*Closing Inventory*" means the Inventory as of 12:01 am Eastern Time on the Closing Date.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Contracts*" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"*Disclosure Schedules*" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement and attached hereto as Exhibit "1".

"*Dollars*" or "*$*" means the lawful currency of the United States.

3

"*Encumbrance*" and "*Encumbrances*" mean any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"*Environmental Claim*" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"*Environmental Law*" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"*Environmental Notice*" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"*Environmental Permit*" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"*Excluded Assets*" has the meaning set forth in Section 2.02.

"*Excluded Contracts*" has the meaning set forth in Section 2.02(b).

"*Excluded Liabilities*" has the meaning set forth in Section 2.03.

"*Good Faith Deposit*" shall mean $150,000.00.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"*Governmental Order*" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"*Hazardous Materials*" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"*Intellectual Property*" means any and all rights associated with the Wing Business and in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("*Patents*"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("*Trademarks*"); (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("*Copyrights*"); (d) internet domain names and social media account or user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media accounts and pages, and all content and data thereon or relating thereto, whether or not Copyrights; (e) mask works, and all registrations, applications for registration, and renewals thereof; (f) industrial designs, and all Patents, registrations, applications for registration, and renewals thereof; (g) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein ("*Trade Secrets*"); (h) computer programs, operating systems, applications, firmware and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof; and (i) all other intellectual or industrial property and proprietary rights.

"*Intellectual Property Assignment*" has the meaning set forth in <u>Section 3.02(a)(ii)</u>.

"*Intellectual Property Registrations*" means all Purchased IP Assets that are subject to any issuance, registration, or application by or with any Governmental Authority or authorized private

registrar in any jurisdiction, including issued Patents, registered Trademarks, domain names and Copyrights, and pending applications for any of the foregoing.

"***Inventory***" has the meaning set forth in <u>Section 2.01(a)</u>.

"***Law***" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"***Liabilities***" means liabilities, Actions, Taxes, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"***Losses***" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers.

"***Material Adverse Effect***" means, between the date of the execution of this Agreement and the Closing Date, any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; but excluding (x) the Bankruptcy Case or events incident thereto; (y) any recalls or liability related to the Excluded Assets, or (z) cancelation of liability insurance by Seller.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"***Post-Closing Tax Period***" means any taxable period beginning after the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period beginning after the Closing Date.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"***Purchase Price***" has the meaning set forth in <u>Section 2.04(a)</u>.

"***Purchased Assets***" has the meaning set forth in <u>Section 2.01</u>.

"***Purchased IP Assets***" has the meaning set forth in <u>Section 2.01(d)</u>.

"***Purchaser Default Termination***" shall have the meaning set forth in <u>Section 2.04(b)</u>.

"***Release***" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation,

ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"*Representative*" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"*Sale Order*" means that certain order entered by the Bankruptcy Court having jurisdiction over the Bankruptcy Case authorizing the sale of the Purchased Assets pursuant to the terms of this Agreement, with such Sale Order being in substantially the form attached hereto as Exhibit "2."

"*Seller*" has the meaning set forth in the preamble.

"*Seller Indemnitees*" has the meaning set forth in Section 7.02.

"*Seller's Knowledge*" or any other similar knowledge qualification, means the actual or constructive knowledge of Charles E. McAtee and Thomas R. Southworth, after due inquiry.

"*Signature Food Marketing*" has the meaning set forth in the preamble.

"*Signature Pack*" has the meaning set forth in the preamble.

"*Signature Select License Agreement*" has the meaning set forth in Section 3.02(a)(iv).

"*Signature Select Trademark*" means collectively "Signature Select", Reg. No. 4769138 and "Signature Select", Reg. No. 4610646, both of which are licensed under that certain Trademark License Agreement dated as of November 16, 2018, by and between Southeast Meats and Signature Pack.

"*Southeast Meats*" means S.E. Meats, Inc., d/b/a Southeastern Meats, an Alabama corporation.

"*Taxes*" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"*Tax Return*" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"*Visionary*" has the meaning set forth in the preamble.

"*Wing Business*" has the meaning set forth in the recitals.

7

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of any Encumbrance, all of Seller's right, title and interest in, to and under the following assets, properties and rights of Seller that relate to, or are used or held for use in connection with, the Business (collectively, the "***Purchased Assets***"):

(a)    The assets of the Business, other than the Excluded Assets, including, but not limited to, all recipes, formulas, customer lists, and other assets necessary to support and conduct such business;

(b)    All inventory associated with the Business, including, but not limited to, usable packaging and raw materials inventory, and finished goods inventory ("***Inventory***");

(c)    All machinery, equipment and fixtures listed on Schedules 2.01(c), all documentation related thereto, and in the event any such machinery, equipment or fixtures are leased by Seller, Seller shall cause such leases to be assigned to Buyer at Closing ("***Assigned Leases***").

(d)    all purchase orders with customers for product that has not shipped as of the Closing Date, as the same are set forth on Schedule 2.01(d) (the "***Assigned Contracts***"). Should Seller receive a payment from a customer (or its assigns) on or after the Closing Date on an Assigned Contract, then Seller shall promptly remit such payment to Buyer; should Buyer receive a payment from a customer (or its assigns) on or after the Closing Date that is not on an Assigned Contract, Buyer shall promptly remit such payment to Seller

(e)    Intentionally Omitted.  .

(f)    the Intellectual Property of the Business set forth on Schedule 2.01(f), whether owned or licensed as indicated, (collectively, the "***Purchased IP Assets***"), together with all (i) royalties, fees, income, payments, and other proceeds accruing on or after the Closing Date with respect to such Purchased IP; (ii) with respect to such Purchased IP, all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation, or other violation thereof, whether accruing before, on, or after the date hereof; and (iii) to the extent such Purchased IP is licensed (including but not limited to the Signature Select Trademark), all rights in or arising under Seller's license of such Purchased IP, including all of Seller's rights in the Signature Select Trademark as well as all of Seller's rights in and to the Trademark License Agreement entered into between Seller and Southeast Meats;

(g)     all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets; and

(h)    all goodwill and the going concern value of the Business.

Within thirty (30) days following the Closing, Buyer shall have the right to elect to return to Seller any of the Purchased Assets and rescind the purchase of the same. If Buyer so elects, Buyer will provide Seller written notice of the same, and will specify which of the Purchased Assets that Buyer is returning and rescinding the purchase of. Within ten (10) days of Seller's receipt of such notice, Seller will take possession from Buyer such rejected Purchased Assets, and in connection with this return, Buyer and Seller will execute any appropriate documentation that is necessary to memorialize Buyer's return of such rejected Purchased Assets provided that no Purchase Price adjustment shall occur based on the terms of this provision.

  **Section 2.02  Excluded Assets.** Other than the Purchased Assets set forth in <u>Section 2.01</u>, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties of Seller, and all such other assets and properties shall be excluded from the Purchased Assets (the "***Excluded Assets***"). Excluded Assets include the following assets and properties of Seller:

    (a) all cash and cash equivalents, bank accounts and securities of Seller;

    (b) all accounts or notes receivable arising out of the Business, and any security, claim, remedy or other right related to any of the foregoing;

    (c) all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories other than that used in the Wing Business;

    (d) all Contracts that are not Assigned Contracts (the "***Excluded Contracts***"), including any employment Contracts;

    (e) all leases that are not Assigned Leases (the "***Excluded Leases***");

    (f) all Intellectual Property of Seller other than the Purchased IP Assets;

    (g) the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

    (h) all insurance policies of Seller and all rights to applicable claims and proceeds thereunder;

    (i) all benefit plans of Seller and assets attributable thereto;

    (j) the assets, properties and rights specifically set forth on <u>Schedule 2.02(j)</u>; and

    (k) the rights which accrue or will accrue to Seller under this Agreement and the Ancillary Documents.

  **Section 2.03  Excluded Liabilities.** Notwithstanding any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of Seller's Affiliates of any kind or nature whatsoever

(the "**_Excluded Liabilities_**"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)    any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)    any Liability for Taxes of Seller (or any member or Affiliate of Seller) or relating to the Business or the Purchased Assets for any Pre-Closing Tax Period;

(c)    any Liabilities relating to or arising out of the Purchased Assets arising, occurring or accruing on or prior to the Closing Date;

(d)    any Liabilities relating to or arising out of the Excluded Assets;

(e)    any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date, or relates to an act or omission arising, occurring or accruing on or prior to the Closing Date;

(f)    any product Liability or similar claim for injury to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller;

(g)    any recall, design defect or similar claims of any products manufactured or sold or any service performed by Seller;

(h)    any Liabilities of Seller arising under or in connection with any benefit plan of Seller providing benefits to any present or former employee of Seller;

(i)    any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(j)    any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(k)    any trade accounts payable of Seller;

(l)    any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not

10

constitute part of the Purchased Assets issued by the Business' customers to Seller on or before the Closing; (ii) did not arise in the ordinary course of business; or (iii) are not validly, expressly and effectively assigned to Buyer pursuant to this Agreement;

(m)    any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same), except for indemnification of same pursuant to Section 7.02 as Seller Indemnitees;

(n)    any Liabilities under any Excluded Contracts;

(o)    any Liabilities under any Contracts which are not validly, expressly and effectively assumed and assigned to Buyer pursuant to this Agreement;

(p)    any Liabilities under any Excluded Leases;

(q)    any Liabilities for Seller's failure to comply with the Worker Adjustment and Retraining Notification Act of 1988, or any state law requiring notice to Seller's employees;

(r)    any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions; and

(s)    any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order.

## Section 2.04   Purchase Price.

(a)    Provided all conditions, terms and contingencies set forth in this Agreement are fully met, Buyer will pay Seller the aggregate purchase price of $1,750,000.00 for the Purchased Assets  (the "***Purchase Price***"). The Purchase Price, less the amount of the Good Faith Deposit, shall be paid by wire transfer of immediately available funds to an account of Seller designed by Seller in writing at least two Business Days prior to Closing. At least one Business Day prior to the Closing Date, Seller will provide Buyer with the filed Sale Order permitting the Seller's sale and conveyance of the Purchased Assets free and clear of all Encumbrances, pursuant to 11 U.S.C. § 363(f).

(b)    Deposit. Within one Business Day of the Execution Date, Buyer shall deposit into escrow with Jones & Walden, LLC in Jones & Walden's IOLTA Trust Account an amount equal to one hundred fifty thousand dollars ($150,000.00) (such amount, the "***Good Faith Deposit***").  The Good Faith Deposit shall become payable to Seller upon the earlier of (a) the Closing, to be applied as a credit towards the Purchase Price, or (b) the proper termination of this Agreement by Seller pursuant to Section 9.1(e) (a "***Purchaser Default Termination***").  The Good Faith Deposit shall be returned to Buyer upon the termination of this Agreement other than pursuant to a Purchaser Default Termination.

## Section 2.05   Intentionally Omitted.

**Section 2.06   Allocation of Purchase Price.** Seller and Buyer agree that the Purchase Price (plus other relevant items) shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as shown on the allocation schedule (the "***Allocation Schedule***"). A draft of the Allocation Schedule shall be prepared by Buyer and delivered to Seller at least 3 business days prior to Bankruptcy Court Sale Hearing.  If Seller notifies Buyer in writing that Seller objects to one or more items in the Allocation Schedule, Seller and Buyer shall negotiate in good faith to resolve such dispute. Buyer and Seller shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule.

**Section 2.07   Third Party Consents.** To the extent that Seller's rights under any Contract or Permit constituting a Purchased Asset, or any other Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its best efforts to obtain any such required consent(s) as promptly as possible, which shall include filing motion(s) pursuant to 11 U.S.C. § 365 to assume and assign such contract(s). If any such consent or assignment shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

## ARTICLE III
### CLOSING

**Section 3.01   Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "***Closing***") shall take place remotely simultaneously on January 31, 2020, or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "***Closing Date***".  For accounting and computation purposes, the Closing will be deemed to have occurred at 12:01 a.m. Eastern Time on the Closing Date.

**Section 3.02   Closing Deliverables.**

(a)      At the Closing, Seller shall deliver to Buyer the following:

(i)      a bill of sale in form and substance satisfactory to Buyer (the "***Bill of Sale***"), duly executed by Seller, transferring the tangible personal property included in the Purchased Assets to Buyer, free and clear of all Encumbrances;

(ii)      an assignment and assumption agreement in form and substance satisfactory to Buyer (the "***Assignment and Assumption Agreement***"), duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets, free and clear of all Encumbrances;

12

(iii)    an assignment in form and substance satisfactory to Buyer (the "*Intellectual Property Assignment*"), duly executed by Seller, transferring all of Seller's right, title and interest in and to the Purchased IP Assets to Buyer, free and clear of all Encumbrances;

(iv)    a license agreement or assignment in form and substance satisfactory to Buyer in which Seller assigns to Buyer all of Seller's rights in and under the Trademark Licesne Agreement between Seller and Southeast Meats (the "*Signature Select License Agreement*"), with such assignment duly executed by Seller and Southeast Meats and approved by the Bankruptcy Court;

(v)    a certified copy of the Sale Order by the Bankruptcy Court authorizing a sale of the Purchased Assets free and clear of all Encumbrances;

(vi)    a certificate of a manager of Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the manager(s) and all members of Seller authorizing the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby;

(vii)    a certificate of the manager(s) of Seller certifying the names and signatures of the officers of Seller authorized to sign this Agreement, the Ancillary Documents and the other documents to be delivered hereunder and thereunder; and

(viii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Purchase Price (less the Good Faith Deposit) by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer;

(ii)    the Assignment and Assumption Agreement, duly executed by Buyer;

(iii)    the Intellectual Property Assignment, duly executed by Buyer;

(iv)    the Signature Select License Agreement, duly executed by Buyer;

(v)    a certificate of a manager of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the members of Buyer authorizing the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are

13

all the resolutions adopted in connection with the transactions contemplated hereby and thereby; and

(vi)    a certificate of the manager of Buyer certifying the names and signatures of the officer of Buyer authorized to sign this Agreement, the Ancillary Documents and the other documents to be delivered hereunder and thereunder.

(vii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to this Agreement.

**Section 3.03    Contingencies to Closing.**  The Buyer's obligation to close on the purchase of the Purchased Assets and to perform its other obligations set forth in this Agreement is completely contingent on the following conditions being fully met by the Closing date:

(1) Buyer entering into a lease agreement, in a form and substance satisfactory to Buyer, with Chow Time, LLC for the lease of certain real property located at 515 Commercial Drive, Stanham, Georgia, known as the "GCS Plant – Statham, Georgia";

(2) Receipt of the agreement and assignment, in a form and substance satisfactory to Buyer, of the Signature Select License Agreement, duly executed by Seller and Southeast Meats, and approval of such agreement and assignment by the Bankruptcy Court;

(3) Entry by the Bankruptcy Court of the Sale Order and no stay of the Sale Order has been entered by Closing;

(4) Receipt of the documents set forth in Section 3.02(a); and

(5) The representations and warranties of Seller contained herein, including those representations and warranties set forth in Article IV, being accurate.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, and after approval of the transactions contemplated hereunder by Bankruptcy Court and after giving effect to the Sale Order, Seller represents and warrants to Seller as of the Execution Date and as of the Closing Date as follows:

**Section 4.01    Organization and Standing.**  Seller is duly incorporated or organized, as applicable, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and, except where the failure to obtain such qualification could not reasonably be expected to have a Material Adverse Effect, is qualified or licensed to do business in each jurisdiction in which the properties owned, leased or operated by Seller makes such qualification necessary.  Seller has all permits necessary to own and operate its properties and to carry on the Business as now conducted by it, except such permits the failure of which to have would not be reasonably expected to have a Material Adverse Effect.

**Section 4.02    Authorization and Power**.  Subject to any necessary authorization from the Bankruptcy Court, Seller has all requisite power and authority to carry on the Business as now being conducted and to execute and deliver the Agreement and Ancillary Documents to which it is a party and to perform its obligations thereunder.  The Agreement and Ancillary Documents to which Seller is a party have been duly executed and delivered by Seller, except such transaction documents that are required by the terms hereof to be executed and delivered after the date hereof, in which case the Agreement and Ancillary Documents will be duly executed and delivered at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court, the Agreement and Ancillary Documents to which Seller is a party constitute, or will constitute, as the case may be, the valid and binding agreements of Seller, enforceable against Seller in accordance with their terms.

**Section 4.03    Title to Assets**.  Subject to Bankruptcy Court approval, Seller has the power and the right to sell, assign and transfer, and Seller will sell and deliver to Buyer, and Buyer will be vested with good, valid, marketable title to, the Purchased Assets, free and clear of all Encumbrances.  Provided the parties acknowledge and agree that the Smokehouse Daddy™ has not been federally registered, but Seller is not aware of any claims which have been or could be asserted to the same, and for a period of 18-months following the Closing Seller will provide Buyer good faith and reasonable assistance to federally register the Smokehouse Daddy™. <u>Schedule 4.3</u> attached hereto lists all Contracts pursuant to which Seller leases tangible assets.

**Section 4.04    Conflicts; Consents**.

(a)    The execution, delivery and performance by Seller of this Agreement and the consummation of the transaction contemplated hereby, and compliance by Seller with any of the provisions hereof do not, or will not at the time of execution, result in the creation of any Encumbrances upon the Purchased Assets and do not, or will not at the time of execution, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provisions of: (i) such Seller's certificate of incorporation, bylaws or comparable organizational documents; (ii) subject to entry of the Sale Order, any Assumed Contract to which such Seller is a party or by which any of the Purchased Assets are bound; (iii) subject to entry of the Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to such Seller or any of the permits, licenses, rights, properties or assets of such Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law.

(b)    Other than the entry of the Sale Order, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is or will become a party, the compliance by such Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the sale, assignment or conveyance of the Purchased Assets.

**Section 4.05    <u>Intentionally Omitted.</u>**

**Section 4.06    Intentionally Omitted**.

**Section 4.07    Closing Inventory**.  The location of all Closing Inventory as of the Business Day prior to the date hereof is set forth on <u>Schedule 4.7</u>.  None of the Closing Inventory consist of items held on consignment.  Seller has not received any payment with respect to products within the Closing Inventory that have not been shipped as of the Closing Date.

**Section 4.08    Intellectual Property**.    <u>Schedule 4.8(a)</u> attached hereto sets forth all registered and unregistered Purchased IP Assets (including registration applications) that Seller owns or otherwise has the right to use in the operation of the Business as presently conducted.  To the Seller's Knowledge, none of the activities or business presently conducted by the Seller infringes or violates, or constitutes a misappropriation of, any Intellectual Property rights of any Person.  The Purchased IP Assets are not subject to any restrictions or limitations regarding use or disclosure other than pursuant to a written license agreement set forth on <u>Schedule 4.8(b)</u> attached hereto.  Since December 31, 2018, Seller has not received any notification from any third party alleging that Seller infringes any Intellectual Property of such third party.  To the Knowledge of Seller, no third party is infringing, misappropriating or otherwise conflicting with any of the Purchased IP Assets.

**Section 4.09    Brokers.** Other than James Ardrey, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Seller.  Seller will pay all fees, commissions and other amounts charged by or owed to James Ardrey.

**Section 4.10    Complete Copies of Materials.**  Seller has delivered to Buyer complete and accurate copies of each document that is referenced in the Disclosure Schedules.

**Section 4.11    Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**Section 4.12    Bankruptcy Court Sale Hearing**. Seller shall use its reasonable efforts to schedule hearings on and obtain the Bankruptcy Court's entry of the Sale Order attached hereto as Exhibit "2" on or before January 23, 2020.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller that the statements contained in this <u>ARTICLE V</u> are true and correct as of the date hereof.

**Section 5.01    Organization of Buyer.** Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Arkansas.

**Section 5.02   Authority of Buyer.** Buyer has full limited liability company power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by each other party hereto) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

**Section 5.03   No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 5.04   Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Buyer.

**Section 5.05   Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**ARTICLE VI**
**COVENANTS**

**Section 6.01   Confidentiality.** From and after the Closing, Seller and Principals shall, and shall cause their respective Affiliates to, hold, and shall use their respective reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning Seller or the Business, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, Principals, any of their respective Affiliates or their respective Representatives; or (b) is lawfully acquired by Seller, Principals, any of their respective Affiliates or their respective

17

Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller, Principals or any of their respective Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller and Principals shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller or a Principal is advised by its counsel in writing is legally required to be disclosed, *provided that* Seller and Principals shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 6.02   Intentionally Omitted.**

**Section 6.03   Intentionally Omitted.**

**Section 6.04   Certain Covenants Regarding Tax Matters.**

(a)    <u>Tax Returns</u>.

(i)    Seller shall prepare and file, when due, Tax Returns for income, gross receipts and similar Taxes (including any business, professional and occupational license Taxes or similar Taxes) required to be filed with respect to the Business or the Purchased Assets for Pre-Closing Tax Periods.  Seller shall be fully liable for the payment of all such Taxes.  Such Tax Returns shall be prepared in a manner consistent with the past practices, unless otherwise required by applicable Law. Seller shall provide Buyer with reasonable opportunity to review and comment on each such Tax Return described in the preceding sentence prior to filing, and shall make changes to such Tax Returns reasonably requested by Buyer to ensure that such Tax Returns are consistent with the terms of this Agreement.

(ii)    Buyer shall prepare and file, when due, Tax Returns with respect to the Business or the Purchased Assets for any Post-Closing Tax. Such Tax Returns shall be prepared in a manner consistent with the past practices, unless otherwise required by applicable Law. To the extent that the Tax Returns filed by Buyer relate to a Pre-Closing Tax Period, Buyer shall provide Seller with a reasonable opportunity to review and comment on each such Tax Return prior to filing. Seller shall reimburse Buyer for Taxes attributable to a Pre-Closing Tax Period for such returns no later than 30 days following a written request for payment thereof.

(b)    <u>Cooperation on Tax Matters</u>. Buyer and Seller shall cooperate fully, as and to the extent reasonably requested by one another, in connection with the filing of Tax Returns pursuant to <u>Section 6.04(a)</u> and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include retaining and, upon the other party's request, providing, records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Seller shall (a) retain all books and records with respect to Tax matters pertinent to Seller relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Buyer, any

18

extensions thereof) of the respective taxable periods and abide by all record retention agreements entered into with any Governmental Authority and (b) give Buyer written notice prior to transferring, destroying or discarding any such books and records and, if Buyer so requests, Seller shall allow Buyer to take possession of such books and records. Buyer and Seller further agree, upon request, to cooperate in good faith to mitigate, reduce or eliminate any Tax that could be imposed by the transactions contemplated hereby. In addition, Buyer and Seller agree to cooperate in good faith in obtaining any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed by the transactions contemplated hereby.

**Section 6.05   Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.01   Indemnification By Seller.** Subject to the other terms and conditions of this ARTICLE VII, Seller shall indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "***Buyer Indemnitees***") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of any breach of this Agreement by Seller, or on account of fraudulent, criminal or intentional misconduct on behalf of Seller.

**Section 7.02   Indemnification By Buyer.** Subject to the other terms and conditions of this ARTICLE VII, Buyer shall indemnify and defend each of Seller and its Affiliates and their respective Representatives (collectively, the "***Seller Indemnitees***") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of any breach of this Agreement by Buyer, or on account of fraudulent, criminal or intentional misconduct on behalf of Buyer.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.01   Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 8.02   Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if

sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by e-mail (with confirmation of transmission). Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 8.02</u>):

| | |
|---|---|
| If to Seller: | Signature Pack, LLC<br>5786 Highway 129 North, Suite N<br>Pendergrass, Georgia 30567<br>E-mail: chuck@signaturefood.com<br>Attention:      Chuck McAtee |
| with a copy to: | Jones & Walden, LLC<br>21 Eighth Street, NE<br>Atlanta, Georgia 30303<br>Facsimile:      (404) 564-9301<br>E-mail: lpineyro@joneswalden.com<br>Attention:      Leslie Pineyro, Esq.<br><br>and<br><br>James Ardrey<br>jardrey58@gmail.com |
| If to Buyer: | Conner & Winters<br>4375 N. Vantage Drive, Suite 405<br>Fayetteville, AR 72703<br>E-mail:      tlewis@cwlaw.com<br>Attention:      Todd P. Lewis, Esq. |

**Section 8.03   Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 8.04   Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 8.05   Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect

any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 8.06   Entire Agreement.** This Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits, Schedules and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 8.07   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 8.08   No Third-party Beneficiaries.** Except as provided in <u>ARTICLE VII</u>, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 8.09   Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 8.10   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Georgia without giving effect to any choice or conflict of law provision or rule (whether of the State of Georgia or any other jurisdiction).

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE INSTITUTED IN THE BANKRUPTCY COURT, OR, IF THE BANKRUPTCY COURT IS FOUND TO LACK JURISDICION, IN THE FEDERAL COURT OF THE UNITED STATES OF AMERICA LOCATED IN THE CITY OF ATLANTA, AND EACH

PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Section 8.11    Remedies.** (a) **By Buyer**:  In the event Seller is not in breach of any term, representation, warranty, covenant or other agreement contained herein, the Sale Order has been entered by January 23, 2020, that fully authorizes Seller to Close on the terms and conditions set forth in this Agreement, and Seller is ready, willing and able to proceed to Closing, but Buyer refuses to proceed to Closing by the Closing Date (and such Closing Date has not otherwise been extended by the mutual written agreement of Buyer and Seller), then Buyer shall be in breach of this Agreement. Seller's sole remedy for such breach is to retain the Good Faith Deposit.    (a) **By Seller**:  In the event Buyer is not in breach of any term, representation, warranty, covenant or other agreement contained herein, the Sale Order has been entered by January 23, 2020, that fully authorizes Seller to Close on the terms and conditions set forth in this Agreement, and Buyer is ready, willing and able to proceed to Closing, but Seller refuses to proceed to Closing by the Closing Date (and such Closing Date has not otherwise been extended by the mutual written agreement of Buyer and Seller), then Seller shall be in breach of this Agreement.  Buyer's remedy for such breach shall either be, in Buyer's discretion: (i) to accept the return of the Good Faith Deposit; or (ii) to seek specific performance of this Agreement by Seller.

**Section 8.12    Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement

**Section 8.13**    The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.   Except as otherwise provided herein, the Purchased Assets are being sold "as is, where is." The parties hereto agree that the obligations contained in this Agreement to be performed after the Closing shall survive the Closing, and each party hereto shall be liable to the other after the Closing for any breach thereof.

# ARTICLE IX

**Section 9.01    <u>Termination</u>**.  This Agreement may be terminated in writing and to the Parties at the address listed above prior to the Closing upon the occurrence of any of the following:

(a)      by mutual written agreement of Buyer and Seller;

(b)    automatically and without any action or notice by Seller to Buyer, or Buyer to Seller, and immediately upon the entry thereof, if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated under this Agreement;

(c)    by Buyer, if, prior to the Closing the Chapter 11 Case shall have been converted to a case under chapter 7 of the Bankruptcy Code or dismissed;

(d)    **by Buyer, if Closing has not occurred by January 31, 2020;**

(e)    **by Seller (provided that Seller is not in breach of any term, representation, warranty, covenant or other agreement contained herein) if the Sale Order has been entered by January 23, 2020, that fully authorizes Seller to Close on the terms and conditions set forth in this Agreement, and all contingencies and conditions of Seller set forth have been fully met, and further Seller is ready, willing and able to proceed to Closing, but Buyer refuses to proceed to Closing by January 31, 2020 (which for purposes of this Agreement is the "Purchaser Default Termination"); or**

(f)    **If the Sale Order is not entered by January 23, 2020**, or at such other time, date or place as Seller and Buyer may mutually agree**.**

[SIGNATURE PAGE FOLLOWS]

23

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER:**

VISIONARY FOODS, LLC.

By:

Name:

Title:   MANAGER

**SELLER:**

SIGNATURE PACK, LLC.

By:   Signature Food Marketing, LLC

Its:   Sole Member

By:

Name:   Charley E. McAfee

Title:   Manager

[Signature Page to Asset Purchase Agreement]

Scanned by CamScanner

# Exhibit "1" follows

## Schedule 2.01(c)
## Machinery, Equipment, and Fixtures

| Asset | Location | Date in service | | Book Value |
|---|---|---|---|---|
| Wall Panels for Marination Project | Pendergrass, GA | 12/20/2016 | $ | 1,321.60 |
| Videojet DATAFLEX PRINTER | Pendergrass, GA | 9/1/2018 | $ | 9,832.09 |
| VFFS Gusset Attach | Pendergrass, GA | 12/31/2009 | $ | - |
| Stainless Steel Tables (4) | Pendergrass, GA | 10/9/2006 | $ | - |
| Stainless Steel Infeed hopper | Pendergrass, GA | 12/1/2015 | $ | 167.75 |
| Glazing Belt | Pendergrass, GA | 12/31/2009 | $ | - |
| 2009 Freight Liner | Pendergrass, GA | 3/1/2017 | $ | 1,865.88 |
| VFFS Access | Pendergrass, GA | 4/1/2010 | $ | - |
| vacuum pump | Pendergrass, GA | 12/1/2018 | $ | 1,872.80 |
| Used L-Bar Sealer | Pendergrass, GA | 2/1/2011 | $ | - |
| UltraCAT 210 Injector | Pendergrass, GA | 12/20/2016 | $ | 66,316.96 |
| Tunnel Walkway | Pendergrass, GA | 3/1/2015 | $ | 157.04 |
| Toyota HPT25 Pallet Jack | Pendergrass, GA | 12/1/2015 | $ | 32.00 |
| Tape Machine | Pendergrass, GA | 9/1/2017 | $ | 55.00 |
| Tables & Wicket Stands | Pendergrass, GA | 12/1/2005 | $ | - |
| Starflex VFFS | Pendergrass, GA | 12/1/2008 | $ | - |
| Stand For Freon Unit | Pendergrass, GA | 12/20/2016 | $ | 5,852.40 |
| SS Vibratory pan | Pendergrass, GA | 12/1/2015 | $ | 93.50 |
| sanitary pipe to go from marination to ice glazer tank | Pendergrass, GA | 3/1/2017 | $ | 344.90 |
| Rolling Ladder | Pendergrass, GA | 12/1/2016 | $ | 436.32 |
| Portable Offices (2) | Pendergrass, GA | 12/1/2006 | $ | - |
| Plant Offices | Pendergrass, GA | 6/1/2015 | $ | 2,234.49 |
| Plant Office Furniture | Pendergrass, GA | 9/1/2015 | $ | - |
| Plant Office | Pendergrass, GA | 6/1/2010 | $ | - |
| Piping for Marination Project | Pendergrass, GA | 12/20/2016 | $ | 5,768.98 |
| panels, extruded aluminum angle for Room 3 Air unit shielding | Pendergrass, GA | 6/1/2017 | $ | 775.00 |
| Mezzanine for Mixing Tanks | Pendergrass, GA | 12/20/2016 | $ | 10,512.19 |
| Mezzanine Flooring | Pendergrass, GA | 12/1/2017 | $ | 3,639.66 |
| Metal Detector | Pendergrass, GA | 4/1/2014 | $ | - |
| Marination Heat Exchanger | Pendergrass, GA | 12/20/2016 | $ | 9,198.00 |
| Interpak USA2024sb Case Taper | Pendergrass, GA | 12/1/2015 | $ | 829.00 |
| Image Printers | Pendergrass, GA | 9/1/2017 | $ | 3,300.00 |
| Hydraulic Tote Dumper | Pendergrass, GA | 12/1/2015 | $ | 215.75 |

1

| | | | | |
|---|---|---|---|---|
| Fortress phantom Metal Detector 8x4 Aperature | Pendergrass, GA | 12/1/2015 | $ | 116.00 |
| Exhaust Fans for Marination Project | Pendergrass, GA | 12/20/2016 | $ | 775.20 |
| Drake Freon Unit | Pendergrass, GA | 12/20/2016 | $ | 28,560.00 |
| Cat Duel Tank 200 Gallon Mixing Tank & 300 Gallon Chiiling System | Pendergrass, GA | 12/20/2016 | $ | 27,777.60 |
| Band Rite #3 | Pendergrass, GA | 7/1/2007 | $ | - |
| 2011 Fortress phantom Metal Detector | Pendergrass, GA | 12/1/2015 | $ | 1,979.00 |
| 2 Yamato 0/16L-S W/A RECOND. SERIAL #'S AFK807530N | Pendergrass, GA | 3/1/2017 | $ | 606.46 |

2

**Schedule 2.01(d)**
**Open Purchase Orders**

[to be provided one business day before Closing]

**Schedule 2.01(e)**
**Contracts to Be Assumed and Assigned**

None.

## Schedule 2.01(f)
## Purchased IP Assets

SIGNATURE SELECT, Reg. No. 4769138 (as licensed to use for IQF chicken wings and other chicken parts in packages no smaller than 2.5 lbs) (owned by and licensed from Southeastern Meats).

SIGNATURE SELECT, Reg. No. 4610646 (as licensed to use for IQF chicken wings and other chicken parts in packages no smaller than 2.5 lbs) (owned by and licensed from Southeastern Meats).

SMOKEHOUSE DADDY, a common-law, unregistered trademark (application pending with the United States Patent and Trademark Office)

## Schedule 2.02(j)

## Excluded Assets

| | |
|---|---|
| Wicket Stands | Pendergrass, GA |
| Walkie Talkies | Pendergrass, GA |
| Stainless Steel Tables (2) | Pendergrass, GA |
| Used Tray Pack sealer | Pendergrass, GA |
| Used Scales from Fresh Frozen | Pendergrass, GA |
| Slider Room Additions | Pendergrass, GA |
| Security Camera System | Pendergrass, GA |
| Scales 20 lb. (8) | Pendergrass, GA |
| Room 4 - Slider Production | Pendergrass, GA |
| Room 3 Improvements | Pendergrass, GA |
| Racks - Room 3 | Pendergrass, GA |
| Plant Radio's (4) | Pendergrass, GA |
| Parts Storage Room | Pendergrass, GA |
| pallet truck & scale | Pendergrass, GA |
| Pallet Jack | Pendergrass, GA |
| Multivac Vacuum Sealer | Pendergrass, GA |
| Leased Forklifts - Capital | Pendergrass, GA |
| Industrial Fans Direct - Air Curtain | Pendergrass, GA |
| HP Laserjet Pro M521dn  Jerry on Dock | Pendergrass, GA |
| Hand Wash Sink | Pendergrass, GA |
| Hand Scales | Pendergrass, GA |
| Fire conveyor #2 | Pendergrass, GA |
| Fire conveyor #1 | Pendergrass, GA |
| Exhaust Fans and Air Curtain | Pendergrass, GA |
| Used PFM Flow Wrapper | Pendergrass, GA |
| Slider Feed Table #2 | Pendergrass, GA |
| 2011 Fortress phantom Metal Detector | Pendergrass, GA |
| 2011 Fortress phantom Metal Detector | Pendergrass, GA |
| Dry Warehouse Racking | Pendergrass, GA |
| Conveyor #2 | Pendergrass, GA |
| Conveyor | Pendergrass, GA |
| Case sealer | Pendergrass, GA |
| Used Flowwrapper #3 | Pendergrass, GA |
| Leased Cartoner #2 | Pendergrass, GA |
| Cartoner Conversion | Pendergrass, GA |

6

| | |
|---|---|
| Baldor Motor | Pendergrass, GA |
| 20 lb. Scales (4) | Pendergrass, GA |
| (4) 20 lb. Scales | Pendergrass, GA |

**Schedule 4.3**
**Leases of Included Assets**

None.

**Schedule 4.6**
**Cure Payments for Executory Contracts**

None.

**Schedule 4.07**
**Location of Closing Inventory**

85 Jackson Concourse
Pendergrass, GA   30567

5786 Hwy 129 North
Suite N
Pendergrass, GA    30567

## Schedule 4.8(a)
## All Registered and Unregistered Purchased IP Assets

SIGNATURE SELECT, Reg. No. 4769138 (as licensed to use for IQF chicken wings and other chicken parts in packages no smaller than 2.5 lbs) (owned by and licensed from Southeastern Meats).

SIGNATURE SELECT, Reg. No. 4610646 (as licensed to use for IQF chicken wings and other chicken parts in packages no smaller than 2.5 lbs) (owned by and licensed from Southeastern Meats).

SMOKEHOUSE DADDY, a common-law, unregistered trademark (application pending with the United States Patent and Trademark Office)

**Schedule 4.08(b)**
**All Written License Agreements for the Purchased IP Assets**

(Trademark License Agreement dated as of November 16, 2018 by and between S.E. Meats, Inc. d/b/a Southeastern Meats, an Alabama corporation and Signature Pack, LLC, a Georgia limited liability company attached below)

# Exhibit "2" follows

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

**IN RE:**

**SIGNATURE PACK, LLC,**

                    **Debtor.**

**CHAPTER 11**

**CASE NO.   19-20916-JRS**

**ORDER APPROVING MOTION OF THE DEBTOR FOR ENTRY OF ORDER
PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 APPROVING (A) EXECUTION OF
ASSET PURCHASE AGREEMENT AND (B) SALE OF CERTAIN ASSETS TO
VISIONARY FOODS,LLC.**

This matter is before the Court on the Motion of the Debtor for Entry of Order Pursuant to

11 U.S.C. §§ 105, 363, and 365 Approving (A) Execution of Asset Purchase Agreement and (B)

Sale of Certain Assets to Visionary Foods LLC. (Doc. No. ___) (the "Sale Motion[1]"), Debtor's

related motion to assume and assign certain executory agreements related to intellectual property

---

[1] Terms not defined in this Order shall be given the meaning defined in the Sale Motion (Doc. No.
___).

1

to Visionary Food, LLC. (Doc. No. ___) (the "Assignment Motion")[2] and Debtor's Motion to Approve Settlement Agreement With JSO[3] (the "JSO Motion") (the Sale Motion, the Assignment Motion and the JSO Motion, collectively, shall be referred to as the "Motions").

A hearing on the Motions was held on January ___, 2020 (the "Hearing). Leslie Pineyro appeared on behalf of the Debtor.

Based upon the statements and arguments of counsel present at the Hearing and upon the Court's review of the record in this case, including without limitation the Motions and upon consideration of the statements and arguments of counsel and proffer of evidence presented at the Hearing, and there being good, sufficient and timely notice of the Motions and the related hearings to all parties in interest, and after due deliberation and there being good cause for the relief sought through the Motions, the Court hereby FINDS and ORDERS as follows:

The Court hereby FINDS as follows:

A. The Court has jurisdiction over the Motions and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of this case and the Motions in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B. The statutory predicates for the relief sought in the Sale Motion are Sections 105, 363, 365, and 1146(c) of 11 U.S.C. §§ 101 et. seq. (as amended, modified or supplemented, the "Bankruptcy Code"), and Bankruptcy Rules 2002, 6004, 6006, and 9014.

---

[2] Separate Orders have or will be entered on the Assignment Motion and Settlement Motion and shall be construed together with this Order. Such Orders are incorporated into this Order as if restated verbatim herein.

[3] The JSO Motion seeks approval of the JSO Settlement as defined in the JSO Motion.

C.  A reasonable opportunity to object or be heard with respect to the Motions and the relief requested therein has been afforded to all interested persons and entities.

D.  The Debtor has exercised sound business judgment in choosing to proceed with a Sale in accordance with the APA.

E.  The Debtor has all of the power and authority necessary to consummate the Sale.

F.  The Debtor has demonstrated and proven to the satisfaction of this Court good, sufficient, and sound business purpose and justification for the Sale and the other transactions contemplated by the related documents necessary to consummate the Sale to Visionary Foods, LLC. ("Buyer"), including without limitation a bill of sale for the certain Assets, assignment documents and other documents required to consummate the Sale (collectively, the "Sale Documents") pursuant to Section 363(b) of the Bankruptcy Code.

G.  The consideration provided by Buyer for the Sale of the Assets, including the Purchase Price, (i) is fair and reasonable, (ii) is the highest and best offer for the Assets, and (iii) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical, available alternative.

H.  The proposed sale of the Assets and associated transactions are in the best interests of the Debtor, its estate and its creditors.

I.  The entry of this Sale Order and the approval of the sale of the Assets pursuant to the APA and the Sale Documents, pursuant to Sections 363(b), 363(f), and 365 of the Bankruptcy Code, are necessary and appropriate to maximize the value of

the Debtor's estate.

J.  The transfer of the Assets to Buyer pursuant to the Sale contemplated by the APA will be a legal, valid, and effective transfer of the Assets, and will vest Buyer with all right, title, and interest of the Debtor to the Assets free and clear of all liens, claims, rights, interests and encumbrances of any kind or nature whatsoever, including but not limited to, those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtor's or Buyer's interest in the Assets, or any similar rights; (ii) relating to taxes arising under, out of, in connection with, or in any way relating to the Assets prior to the Closing; and (iii) (A) all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal, or charges of any kind or nature, if any, including, but not limited to, any restriction of the use, transfer, receipt of income or other exercise of any attributes of ownership, and (B) all debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtor, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests, and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these cases pursuant to Chapter 11 of the Bankruptcy Code, and whether imposed by agreement, understanding, law, equity or otherwise, including but not limited to claims otherwise arising under doctrines of successor liability (collectively, the "Interests").

4

K.  Buyer would not consummate the transactions contemplated by the APA and Sale Documents, thus adversely affecting the Debtor, its estate, and its creditors, if the Sale of the Assets to Buyer were not free and clear of all Interests of any kind or nature whatsoever, or if Buyer would, or in the future could, be liable for any of the Interests.

L.  The Debtor may sell the Assets to Buyer under the terms of the APA and Sale Documents free and clear of all Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in Section 363(b)(1)-(5) of the Bankruptcy Code has been satisfied;

M.  Those non-debtor parties with claims or Interests in the Assets who did not object, or who withdrew their objections, to the Sale, or any of the Motions are deemed to have consented to the Sale to Buyer pursuant to Sections 363(b)(2) of the Bankruptcy Code;

N.  The transfer of the Assets to Buyer and the related transactions are exempt under Section 1146(c) of the Bankruptcy Code from any documentary, transfer, stamp, sales, use or similar tax or any so- called "bulk-sale" law in all necessary jurisdictions related to the Sale and transfer of the Assets to Buyer; and

O.  Time is of the essence in closing the Sale.

For all of the foregoing reasons, and after due deliberation, the Court ORDERS, ADJUDGES, AND DECREES THAT:

1.    The Sale Motion is GRANTED, as further described herein.

2.    The Sale and all of the terms and conditions thereof and all related transactions are hereby approved in all respects.

5

3.     Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor is authorized to perform its obligations under, and comply with the terms of the Sale and consummate the Sale and the related transactions, pursuant to, and in accordance with, the terms and conditions of the APA and Sale Documents.

4.     In consideration of the Assets, and upon the terms of the APA, Buyer shall pay the consideration contemplated thereunder.

5.     The Debtor is authorized to execute and deliver, and empowered to perform under, consummate, and implement under the Sale Documents, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale and to take all further actions as may be reasonably requested by Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to Buyer or reducing to possession, the Assets, or as may reasonably be necessary or appropriate to the performance of the obligations as contemplated by the Sale as consummated through the Sale Documents.

6.     This Sale Order and the Sale Documents shall be binding in all respects upon all creditors (whether known or unknown) of the Debtor, all successors and assigns of Buyer, the Debtor, and its affiliates and subsidiaries, the Assets, and any subsequent trustee(s) appointed in the Debtor's Chapter 11 case or upon a conversion thereof to Chapter 7 under the Bankruptcy Code and shall not be subject to rejection.

7.     Nothing contained in any Chapter 11 plan confirmed in this bankruptcy case or in the confirmation order confirming any such Chapter 11 plan, any order converting this case to Chapter 7, or any order dismissing this case shall conflict with or derogate from the provisions of the Sale, the Sale Documents or this Sale Order.

8.     The Sale Documents and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided that any such modification, amendment, or supplement is not material and does not adversely affect the Debtor's estate or Buyer.

9.     Except as expressly permitted or otherwise specifically provided for in the Sale Documents or this Sale Order, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, the Assets shall be transferred to Buyer at, and subject to and conditioned upon, the Closing, and upon Closing shall be, free and clear of all Interests of any kind or nature whatsoever.

10.    Except as expressly permitted or otherwise specifically provided by the Sale Documents or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, governmental, tax, and regulatory authorities, lenders, employees, trade, and other creditors holding Interests of any kind or nature whatsoever against or in the Debtor or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under, out of, in connection with, or in any way relating to, the Debtor, the Assets, the operation of the Business prior to the Closing, or the transfer of the Assts to Buyer, are forever barred, estopped, and permanently enjoined from asserting any such claims against Buyer, its successors or assigns, its property, or the Assets, such persons' or entities' Interests, subject to the rights of non-debtor parties to the Contracts and Leases to be assumed and assigned pursuant to the Sale Documents.

11.    The consideration provided by Buyer for the Assets pursuant to the Sale

Documents shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia and is fair and reasonable and may not be avoided under Section 363(n) of the Bankruptcy Code.

12.     This Sale Order shall be: (a) effective as a determination that, on the Closing, all Interests of any kind or nature whatsoever existing as to the Debtors or the Assets prior to the Closing (other than the interests of non-debtor parties under the Contracts and Leases assumed and assigned at Closing) have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected; and (b) binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

13.     This Court retains jurisdiction to enforce and implement the terms and provisions of this Sale Order and the Sale Documents, along with all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Assets to Buyer or performance of other obligations of Debtor under the Sale Documents, subject to the terms and conditions of the Sale Documents; (b) resolve any disputes arising under or related to the Sale Documents, except as otherwise provided therein,

and (c) interpret, implement, and enforce the provisions of this Sale Order, however, in the event the Court abstains from exercising or declines to exercise such jurisdiction with respect to the Sale Documents or this Sale Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon, and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

14.      The transactions contemplated by the Sale and by the Sale Documents are undertaken by Buyer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale of the Assets to Buyer (including the assumption, assignment, and sale of any of the Contracts and Leases), unless such authorization is duly stayed pending such appeal. Accordingly, Buyer is a purchaser in good faith of the Assets and is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

15.      The terms and provisions of the Sale, the Sale Documents and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, and its creditors; Buyer, and its respective affiliates, successors, and assigns; and any affected third parties including, but not limited to, all persons asserting an Interest in the Assets to be sold to Buyer pursuant to the Sale Documents, notwithstanding any subsequent  appointment of any trustee(s), party, or entity, or other fiduciary under any section of any chapter of the Bankruptcy Code or, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.

16.      The failure to specifically include any particular provisions of the Sale Documents in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Documents be authorized and approved in their entirety.

17.    The transfer of the Assets is a transfer pursuant to Section 1146(c) of the Bankruptcy Code, and accordingly, the transfer of the Assets (including without limitation, both real and personal property) to Buyer does not and will not subject the Debtor or Buyer, their respective affiliates, or designees to any liability for any documentary, transfer, stamp, sales, use or similar tax or any so-called "bulk-sale," to the fullest extent permitted by Section 1146(c) of the Bankruptcy Code. Each and every federal, state, and local government agency or department that was served with the Sale Motion or notice thereof is directed to accept any and all documents and instruments necessary and appropriate to consummate the transfer of any of the Assets, all without imposition or payment of any stamp tax, transfer tax, or similar tax.

18.    As provided by Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately upon entry. Time is of the essence in closing the transactions contemplated by the Sale Documents, and the Debtor and Buyer intend to close the Sale and related transactions as soon as possible.

19.    Notwithstanding anything to the contrary herein or otherwise, and pursuant to the Order authorizing the employment of James B. Ardrey (Doc. No. 116), Debtor shall be authorized to pay at Closing the $200,000 Sale Transaction Fee (the "Ardrey Fee") directly to Ardrey out of the gross proceeds of the Purchase Price.

20.    Debtor shall be authorized to utilize the Sale Proceeds generated from the Purchase Price to pay obligations as follows:

(a)  such amount as is necessary to pay off the Renasant secured claim;

(b)  the Ardrey Fee;

(c)  the amount necessary to pay off the JSO Settlement;

10

(d) Customary closing costs attributable to Debtor as seller; and

(e) All net proceeds remaining thereafter to be held in the IOLTA Trust Account of Debtor's counsel, Jones & Walden, LLC until further order of the Court.

21.    Any monies collected or received by Debtor from the Excluded Assets, including the collection of any accounts receivable, shall be paid to the IOLTA Trust Account of Debtor's counsel, Jones & Walden, LLC, for use in accordance with the terms of this Order or until further order of the Court.

22.    The following items may be paid from funds collected by Debtor or held in trust in Jones & Walden, LLC's IOLTA Trust Account without further order of the Court:

(a) Any quarterly fees due and payable to the United States Trustee;

(b) Payroll for Debtor's payroll obligations incurred prior to the Closing and associated payroll taxes and benefits payments;

(c) Any insurance that comes due regarding any Excluded Assets or otherwise necessary for the winding down of Debtor's operations, or amounts owed for insurance prior to the Closing; and

(d) The amounts reasonably necessary for retention or hiring of persons to finalize Debtor's books and records and assist in the winddown of Debtor's finances and business subject to the maximum gross amount of $2,500 per week for up to a total of $15,000.00, inclusive of employee payroll obligations, plus the associated amount of employer payroll obligations for such services.

(e) Any amount necessary to destroy or dispose of any unusable or unserviceable product.

23. Notwithstanding Bankruptcy Rule 6004 or otherwise, this Order shall be effective immediately on entry and any stay of this Order is waived so that Debtor and Buyer may close the sale contemplated herein immediately upon entry of this Order and the Sale Proceeds shall be disbursed as stated herein immediately upon closing of the sale.

~END OF ORDER~

Order prepared and presented by:

*/s/ Leslie M. Pineyro*
Leslie M. Pineyro
Georgia Bar No. 969800
Thomas T. McClendon
Georgia Bar No. 431452
Jones & Walden, LLC
21 Eighth Street, NE
Atlanta, Georgia 30309
(404) 564-9300
lpineyro@joneswalden.com

*Attorneys for Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | |
|---|---|
| IN RE: | **CHAPTER 11** |
| **SIGNATURE PACK, LLC,** | **CASE NO. 19-20916-JRS** |
| Debtor. | |

**CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2020, the foregoing *Motion of the Debtor for Entry of Order Pursuant to 11 U.S.C. §§ 105, 363, and 365 Approving (A) Asset Purchase Agreement and (B) Sale of Certain Assets to Visionary Foods LLC* was electronically filed using the Bankruptcy Court's Electronic Case Filing program, which sends notices of and accompanying links to the Motion to the following parties who have appeared in these cases under the Bankruptcy Court's Electronic Case Filing Program:

- **Griffin B. Bell**    gbb@gb3pc.com, dts@gb3pc.com;admin@gb3pc.com
- **Frederic S. Beloin**    fbeloin@beloinlaw.com, jkuhar@beloinlaw.com
- **Sam G. Bratton**    sbratton@dsda.com, kstratton@dsda.com;dbkirk@dsda.com
- **David A. Garland**    dgarland@mcdr-law.com, dgarland@mcdr-law.com;hjohnson@mcdr-law.com
- **Lee B. Hart**    lee.hart@nelsonmullins.com, ayo.uboh@nelsonmullins.com
- **Sean C. Kulka**    sean.kulka@agg.com
- **Leah Fiorenza McNeill**    Leah.Fiorenza@bclplaw.com, b.lyle@bclplaw.com
- **Office of the United States Trustee**    ustpregion21.at.ecf@usdoj.gov
- **Stephan A. Ray**    sray@mcdr-law.com, hjohnson@mcdr-law.com
- **Michael D. Robl**    michael@roblgroup.com
- **Andres H. Sandoval**    andres.sandoval@usdoj.gov, charlie.cromwell@usdoj.gov;Larissa.selchenkova@usdoj.gov
- **Shayna M. Steinfeld**    shayna@steinfeldlaw.com
- **Thomas R. Walker**    thomas.walker@fisherbroyles.com
- **David S. Weidenbaum**    david.s.weidenbaum@usdoj.gov
- **David A. Wender**    david.wender@alston.com

This 14th day of January, 2020.

**JONES & WALDEN, LLC**
*/s/ Leslie M. Pineyro*
Leslie M. Pineyro
Georgia Bar No. 969800
Attorney for Debtor
21 Eighth Street, NE
Atlanta, Georgia 30309
(404) 564-9300
lpineyro@joneswalden.com